Argued and submitted October 5, reversed December 7, 2011

In the Matter of N. E. F.-J.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

B. L. J.,
*Appellant.*

Jackson County Circuit Court
080046J;
Petition Number 080046JB;
A148452 (Control)

In the Matter of A. L. J.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

B. L. J.,
*Appellant.*

Jackson County Circuit Court
110067J;
Petition Number 110067JA;
A148454

268 P3d 696

Shannon Flowers, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan,

Chief Defender, Appellate Division, Office of Public Defense Services.

Samuel A. Kubernick, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

Mother appeals the juvenile court's judgments taking jurisdiction over her children, N and A, asserting that the judgments are not supported by sufficient evidence. Mother acknowledges that she has cognitive deficits that prevent her from parenting independently but contends that, because the undisputed evidence at the jurisdictional hearing was that she was living with another adult who was willing to supervise and support her in her parenting, the children's circumstances did not justify juvenile court jurisdiction. We agree and reverse.

We have the discretion to review this case *de novo*, ORS 19.415(3)(b), but the parties do not ask us to do so, and we decline to do so. *See* ORAP 5.40(8)(c) (we exercise our discretion to review *de novo* only in "exceptional" cases). Therefore, "our task is to review the facts found by the juvenile court to determine whether they are supported by any evidence and then to determine whether, as a matter of law, those facts together with facts implicitly found by the juvenile court provide a basis for juvenile court jurisdiction[.]" *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010).

The relevant facts are few and undisputed. In January 2011, the Department of Human Services (DHS) filed dependency petitions on behalf of N and A. Both petitions alleged that mother has cognitive limitations "which impair her ability to care for the child." At the time of the filings, N had recently been surrendered to DHS by his paternal aunt, who had been caring for him, and was in community foster care. A, who was born in late December 2010, was living with mother.

In March 2011, when N was three years old and A was three months old, the juvenile court held a hearing on the petitions. DHS presented evidence that mother has "mild mental retardation." According to the DHS witnesses who worked with mother during parenting classes and supervised visits, mother is loving, patient, and kind. Mother has learned certain parenting skills and can apply them as demonstrated, but she has a limited ability to anticipate and

respond to new situations. She also has a limited understanding of child development. As a result, mother has failed, at times, to respond to N's needs and recognize potential safety hazards. For example, according to one DHS witness, mother continued to treat N as a baby when he was more than a year old; she would give him a bottle or rock him when he fussed, even if that was not what he wanted or needed, because she could not read his cues. According to the same witness, mother—who is easily distracted and eager to please others—would engage in conversations with other adults and allow N to toddle across a room and put himself in places where he could fall or objects could fall on him. None of the DHS witnesses who evaluated or worked with mother believed that mother could parent N and A on her own.

At the jurisdictional hearing, mother did not contend that she could parent N and A independently. Instead, she contended that she could parent the children with the assistance of a family friend, Bingham. At the time of the hearing, mother and A had been living with Bingham and Bingham's husband for approximately two months. Bingham testified that she and her husband "love" having mother and A in the house. Bingham also testified that she and her husband had discussed having N live with them as well, and they were willing to "have another little one running around."

While living with Bingham, mother was responsible for A's care. Bingham testified, "I told [mother] the same thing I told my boys, I am not a built in babysitter. You are the mom, you're responsible. Any questions, any problems, I'm here, but [you are] the mom." Bingham further testified that she and her husband

> "told [mother], 'We're willing to teach you and be all the support you need as long as you want it, but you've got to,' you know, * * * she's got to carry it on herself. Because she's got to really prove that she wants—I believe in tough love. I've had to do it with two of my kids. So, you know, there is just—if you want something bad enough you will work for it. And that's just my philosophy on life, you know. The harder you work for something, you will achieve it."

After the presentation of evidence, DHS's counsel argued that "the question here is whether or not [mother] is

able to parent by herself. That's what the allegation says is that [mother] has cognitive limitations that impair her ability to parent." Mother's counsel responded that "[t]here is no requirement by statute or case law that a parent must be able to independently parent their child or children and then they'll be taken away if they can't." Mother's counsel summarized:

> "So I don't think the Court can take jurisdiction even if you find her ability to care for the child is impaired because she is making all the arrangements necessary for the child's safety and well-being. And we often forget about the prelude to the allegations that the child's parents are failing to provide them with the care, guidance, and protection necessary. She is making these arrangements and has."

At the end of the hearing, the juvenile court concluded that the state had proved that mother has cognitive limitations but took under advisement the question of whether those limitations impaired mother's parenting. Shortly thereafter, the court entered written judgments finding that the state had proved that mother has cognitive delays that impair her ability to parent the children. The court made no findings regarding the nature or adequacy of the supervision and support mother was receiving from Bingham.

On appeal, mother argues, as she did below, that "the juvenile code does not require that a parent be able to *personally* provide all care for her children, so long as the inability to provide care does not endanger them, *i.e.*, another adult is present and capable of caring for the children." (Emphasis in original.) She also argues that the possibility "that [she] might choose to leave her supportive environment *at some point in the future* does not establish a *current* threat of serious loss or injury." (Emphasis in original.)

In response, DHS argues that "mother's cognitive limitations and inability to parent independently in a safe manner represent a current threat of harm to the children." DHS further argues that, even though mother and A were living with Bingham at the time of the jurisdictional hearing, "the threat of harm to the children's welfare was still current" for two reasons. First, according to DHS, "it is questionable

whether Bingham could provide the level of parenting supervision and support that mother and both children need[.]" Second, because of the voluntary nature of mother's living arrangement with Bingham, "mother is free to leave at any time."

With the arguments thus framed, we turn to the relevant law. As we explained in *State v. S. T. S.*, 236 Or App 646, 654, 238 P3d 53 (2010):

"Under Oregon's juvenile code, a juvenile court has 'exclusive original jurisdiction' in a case involving a child '[w]hose condition or circumstances are such as to endanger the welfare of the person or of others,' ORS 419B.100(1)(c), or whose parents '[f]ailed to provide the person with the care, guidance and protection necessary for the physical, mental or emotional well-being of the person,' ORS 419B.100(1)(e)(D). Our cases have established that a child's 'condition or circumstances' warrant the protection of juvenile court jurisdiction when, 'under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child.' *State ex rel Juv. Dept. v. Vanbuskirk*, 202 Or App 401, 405, 122 P3d 116 (2005) (citing *State ex rel Juv. Dept. v. Smith*, 316 Or 646, 652-53, 853 P2d 282 (1993))."

(Brackets in *S. T. S.*) The focus of the jurisdictional inquiry is the *child's* condition or circumstances. *Id.* at 654. In order for the child's condition or circumstances to justify juvenile court jurisdiction, they must give rise to a current "threat of serious loss or injury to the child." *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011).

DHS bears the burden of proving facts sufficient to justify jurisdiction. *C. Z.*, 236 Or App at 443. Thus, in this case, DHS had to prove that, under the totality of the circumstances, there was a reasonable likelihood of harm to the children's welfare.

It failed to do so. As mentioned, DHS's argument at the jurisdictional hearing was that the juvenile court could take jurisdiction over the children because mother could not parent them independently. But, as mother correctly argued at the hearing, there is no legal requirement that a parent be able to care for his or her children independently. *See State ex*

*rel Dept. of Human Services v. Smith,* 338 Or 58, 86, 106 P3d 627 (2005) (observing that "there is no statutory requirement that a parent be able to care for the child 'independently.' All that [the juvenile code] requires is that the parent's inability to parent the child independently not work to the detriment of the child.").

Perhaps because DHS believed that the only question in the case was whether mother could parent independently, it failed to present evidence to establish that, *"under the totality of the circumstances,* there [was] a reasonable likelihood of harm to the welfare of the child[ren]." *Vanbuskirk,* 202 Or App at 405 (emphasis added). As described, at the time of the jurisdictional hearing, Bingham and her husband were willing to have mother and N and A live with them and to support mother in her parenting. DHS failed to carry its burden of proving that there was a "reasonable likelihood of harm," *id.,* to the children in such an environment. In other words, DHS failed to prove that the children would be at risk of "serious loss or injury," *A. F.,* 243 Or App at 386, while living with mother in Bingham's house.

As mentioned, DHS argues that, even if the children will not be at risk in Bingham's house, mother might leave Bingham's house. That is true, but DHS must prove that there is a *current* risk of harm. *S. T. S.,* 236 Or App at 654. Although there may be cases in which a parent's past conduct provides a basis for concluding that it is reasonably likely that the parent will change his or her children's circumstances to their detriment, this is not such a case. The record provides no basis for concluding that it is reasonably likely that mother will leave her current supportive environment.

Reversed.