Argued and submitted March 10, reversed May 20, 2015

In the Matter of N. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. B.
and S. U.,
*Appellants.*

Multnomah County Circuit Court
2014802782;
Petition Number 110605M;
A157767

350 P3d 558

Valerie Colas, Deputy Public Defender, argued the cause for appellant A. B. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

George W. Kelly argued the cause and filed the brief for appellant S. U.

Jeff J. Payne, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

TOOKEY, J.

**TOOKEY, J.**

Mother and father appeal a judgment of the juvenile court taking jurisdiction over their one-year-old daughter, N. Parents contend that, in light of their decision to cede care of N to N's paternal grandmother (grandmother), the evidence that the Department of Human Services (DHS) presented at the jurisdictional hearing, which focused on parents' risk-causing behaviors, did not demonstrate that N's condition and circumstances were such as to endanger her welfare. ORS 419B.100(1)(c). DHS responds that ORS 419B.100(2) prohibits us from considering grandmother's care of N in evaluating N's condition and circumstances. We disagree. The proper inquiry is whether N's condition and all of her circumstances, including parents' conduct, grandmother's care of N, and all of the circumstances attendant to the arrangement between parents and grandmother, expose N to a current threat of serious loss or injury. Here, DHS did not contend that there was any nexus between the risk-causing conduct that it proved and a threat of serious loss or injury to N. Accordingly, we reverse.

In April 2014, DHS filed a dependency petition alleging that N and her four-year-old half sister, K,[1] were within the jurisdiction of the juvenile court because their "condition or circumstances are such as to endanger the welfare of the person or of others." ORS 419B.100(1)(c). In the second amended petition, DHS again alleged that the juvenile court had jurisdiction under ORS 419B.100(1)(c). At the jurisdictional hearing, which took place in August 2014, the court determined that DHS had proved the following allegations:

"B.  The mother exposed the children to persons who present a risk of harm to the children.

"C.  The mother needs the assistance of the Department of Human Services to develop parenting skills because she

---

[1] Mother is also the mother of K. K has no legal father, but father is her "psychological father" and she is very bonded to him. Mother separately appealed the judgment of jurisdiction as to K, who was in mother and father's care, not grandmother's. In that appeal, we affirmed without opinion. *Dept. of Human Services v. S. U.*, 269 Or App 598, 346 P3d 668 (2015).

Throughout this opinion, we refer to the children as N and K; quotations have been modified accordingly.

lacks the skills necessary to avoid exposing her children to dangerous and harmful people and places.

"D. The mother's substance abuse interferes with her ability to safely parent the children.

"* * * * *

"H. The father * * * is involved in criminal activities that interfere with his ability to safely parent his child.

"I. The father exposed the child, K, to criminal activity, drugs, and guns. He needs the assistance of the Department of Human Services in order to learn the parenting skills necessary to safely parent his child and protect her from harm.

"J. The father's * * * substance abuse impairs his judgment and ability to safely parent his child."

The court also found that, as alleged in allegation G, there is no legal father for K. The court entered a judgment that, as relevant to this appeal, took jurisdiction over N. Both parents appeal.

On appeal of a judgment of dependency jurisdiction, we may review the facts *de novo*. ORS 19.415(3)(b); *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010). Where, as here, no one has requested *de novo* review and we do not undertake it, we "assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record," and "further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013). We state the facts consistently with that standard.

Mother and father first became romantically involved in May 2009, while mother was pregnant with K. In June 2010, father was arrested at parents' home in northeast Portland for a probation violation; during the arrest, police found a gun in a closet, which resulted in father's conviction on a charge of felon in possession of a weapon. Later that year, while father was in prison as a result of that

conviction, parents separated. They reunited in October 2011, after father was released. They began living together again shortly thereafter.

N was born in May 2013 and lived with parents and K for three months. When N was born, the family lived in the same apartment complex as grandmother and father's sister, aunt. In June 2013, grandmother moved to Scappoose. Soon after, aunt joined her there. Aunt is in the process of purchasing the house that she and grandmother share.

In August 2013, parents brought N to stay with grandmother in Scappoose. At first, they visited every few days; later, after the semester started at Portland Community College, where both parents were enrolled, they would visit every week. After December or January, they visited every two to three weeks. When parents visited, they would bring K. Grandmother testified that, when N had a doctor's appointment, aunt would take N to parents the morning of or the evening before the appointment and parents would take her to the appointment. Grandmother explained that she and aunt were very attached to N; in particular, aunt "really didn't want to give her back. And so she was just kind of our baby." She explained that, by April 2014, the arrangement was indefinite: "We would have kept her until she graduated from college, if that [was what happened]. We were prepared for that." A DHS worker who had observed family visits with the children, which included grandmother and aunt, noted that N was very bonded to grandmother. He observed that, "[t]he majority of the time N was actually being held by [grandmother], and N's spending the majority of her time [during the visits] with [grandmother]."

At the time of the hearing, in August 2014, mother was 25. In the past, she had worked as a dancer at various strip clubs in Portland and, in the summer of 2011, while father was in prison, she had worked as a prostitute. Neither child was ever exposed to those activities. In December 2013, mother stopped dancing at strip clubs and, in January 2014, began working part-time as a cashier at a Rite Aid in northeast Portland. At the time of the jurisdictional hearing, mother was still working at Rite Aid and was anticipating a promotion. Father, who was 34 at the time of the

hearing, has several criminal convictions beginning with a conviction for third-degree assault entered in 1997.

Both parents admitted that they use marijuana and cocaine. Mother used cocaine while she was dancing; after she stopped dancing, she used it occasionally. When she was going to use drugs, she would leave K (as well as N) with grandmother. Mother sometimes used drugs even after she started working at Rite Aid, where she was subject to random drug testing. Shortly after the children were taken into DHS custody, mother submitted a urine sample that tested positive for both marijuana and cocaine. Father uses marijuana regularly; mother testified that he used it every other day. Father leaves the house when he uses marijuana.

In November 2013, the police stopped parents as they were leaving a party where they had smoked marijuana. Mother, who has never had a driver's license, was driving a car that she owned; at the jurisdictional hearing, she admitted that she was high during that stop. A 16-year-old girl was also in the car. The police found a marijuana pipe and marijuana in the car and a gun in the glove compartment, which was locked. The gun belonged to mother, who knew that father was not to be around weapons. The police also found a baggie of cocaine in father's pocket.

On the night of April 22, 2014, while mother was working an overnight shift at Rite Aid, father took K with him to what turned out to be a controlled drug buy. After police officers removed father and his companion from the car and arrested father, they discovered K sleeping in the back seat. They took her into protective custody and placed her in foster care that night. Mother denied that father had taken K to a drug deal.

The next day, April 23, after a shelter hearing, the court ordered DHS to continue K in care and take N into protective custody. The next day, April 24, mother met with the assigned DHS caseworker, Kennedy, and told him that N was at grandmother's house in Scappoose. Kennedy told mother to bring N to his office, but she did not do so. In the afternoon, Kennedy, a police officer, and a third person took N from grandmother's house and placed her

in nonrelative foster care. Kennedy attempted to obtain emergency certification for grandmother as a foster-care placement, but he could not do so as a result of a founded disposition in DHS records that dated back to 1992, when father was a child.[2]

In June 2014, parents were evicted from their apartment; they were staying with a friend at the time of the jurisdictional hearing. Both parents testified that, if it were necessary in order to be reunited with the children, parents would move in with grandmother. Grandmother testified that, if the children were returned, parents and the children could move in with her. In closing argument, DHS contended that parents had "stated that the children, if they were returned to them today, they wouldn't go home with the parents. They would go home to [grandmother]."

At the jurisdictional hearing, father contended that N was "nowhere near any of" parents' risk-causing conduct and that parents had "show[ed] good judgment" by placing N with grandmother. Mother argued that she had "done a good job of raising her children or seeing that they are being raised by someone or cared for by someone who is trustworthy and doing a good job" and that parents had "conceded *** custody of N to [grandmother]."

In closing argument, DHS pursued two lines of argument regarding N. First, DHS briefly argued that, as to allegations B and C—which alleged that mother had exposed the children to persons who present a risk of harm—"if N had been in the care of [parents] at the April 22nd date, *** N could just as well have been exposed to this drug deal. Because there were no other persons available in the home to watch N."

Second, DHS returned to a line of reasoning that it had raised in questioning its witnesses. That line of reasoning was that parents' decision to send N to grandmother *itself* presented a risk to N because, as Kennedy put it in his testimony,

---

[2] No further information about that founded disposition appears in the record. At the time of the hearing, DHS was attempting to have grandmother certified as a placement for both children.

"during the first *** few months of development and the first few years of development, it's most important for the child to be with their primary parent for building bond and bonding relationships, and particularly with the mother and the child. It's important for them to spend—not only spend time and having that direct contact and care for, it—it leads to what we call the parent-child bond. And I felt that was kind of concerning and that [mother] was not caring for her own daughter."

On redirect examination, after Kennedy noted that, during family visits, N had mostly been held by grandmother, which suggested that grandmother had been her primary care-giver before DHS became involved, Kennedy agreed with DHS's attorney's statement that, "given that [N] was eleven months of age at removal, that arrangement would tend to prevent parent-child bonding."

In closing argument, DHS returned to the idea that parents'—and, particularly, mother's—decision to give N to grandmother showed that they were inadequate parents to both children: "This is a mother who has a pattern of leaving her children in the care of others so that she can engage in these activities, which include substance abuse and criminal activities." The fact that, in DHS's view, if the children were returned to parents immediately after the hearing, "[t]hey would go home to [grandmother]" rather than to parents provided further support for that argument.

Notably, DHS did not argue that N had been exposed to a risk of harm while she was in grandmother's care, and it did not present evidence indicating any way in which parents' risk-causing conduct would present a risk to N if parents and N all lived with grandmother. Rather, as explained above, DHS's primary argument was that parents' bad judgment was confirmed by the fact that they had left, and would likely continue to leave, primary parenting of N to grandmother. DHS did not ask the juvenile court to consider whether a risk to N would exist if parents and N lived with grandmother. DHS also did not refer to ORS 419B.100(2).

As to N, the court explained its decision to take jurisdiction as follows:

"I struggled with N. As we all know, N's been living with her grandmother and her aunt. And I didn't hear any testimony that she was not cared for. Mother made the election to—and father elected to leave her with grandmother, and that's where she's been for her little life.

"But I do find that the issues presented, the substance abuse issues and the judgment issues regarding—involving K extend to N, because those parenting decisions are going to be made for both children."

Accordingly, it entered a dependency judgment taking jurisdiction over N.

Both parents appeal, contending that, even if their conduct presented a risk to K, who was in their care, that conduct did not present a risk to N because she was not in their care. Parents contend that "the totality of *N's* circumstances was that she was being cared for by grandmother and aunt and the court had to determine whether grandmother and aunt caring for N would expose her to a threat of serious loss or injury that was likely to be realized." (Emphasis in father's brief.) In parents' view, DHS failed to demonstrate any nexus between parents' conduct and a risk of harm to N.

In his reply brief, father cites *Dept. of Human Services v. A. L.*, 268 Or App 391, 342 P3d 174 (2015), which issued after parents filed their opening briefs, as further support for parents' view. In *A. L.*, the parents appealed judgments taking jurisdiction under ORS 419B.100(1)(c) over their three children, two of whom had lived with the paternal grandparents for their entire lives. DHS had placed the youngest child with another relative shortly after birth. *Id.* at 394. The parents, who lived sporadically in the paternal grandparents' household, "interacted with [the children] like close relatives rather than parents." *Id.* at 393.

DHS filed dependency petitions as to all three children after the third child tested positive for methamphetamine at birth. *Id.* at 394. At the time of the hearing, in addition to having concerns about the parents' ability to safely care for the children because of their drug abuse and lack of parenting skills, DHS also had concerns about the

paternal grandparents' ability to safely care for the children. *Id.* at 398.

We held that, in light of the parents' entrustment of the children to the paternal grandparents, DHS had not showed any connection between the parents' conduct and a risk of harm to the children. *Id.* at 400. Nor had DHS showed a risk that the paternal grandparents' care had created a reasonable likelihood of harm to the children. *Id.* at 398-400. Finally, we explained:

> "DHS's arguments rest on a mistaken assumption that parents cannot give custody of their children to people who are not DHS-certified. To the contrary, the court must have jurisdiction for DHS to change the placement of children and, for jurisdiction to be warranted, there must be a current threat of harm to the children. ORS 419B.100(1)(c). Because parents have entrusted the primary care of the children to the paternal grandparents, who do not pose a current threat of harm, the court did not have a basis for asserting jurisdiction over the children. *See State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 86, 106 P3d 627 (2005) (concluding that, where mother's family did not pose a threat to the child, that mother's inability to parent independently did not amount to a condition seriously detrimental to the child)."

*Id.* at 400. Accordingly, we reversed the jurisdictional judgments.

In this case, father contends that, under *A. L.*, parents' "decision to voluntarily cede all the primary caregiving responsibilities for N to grandmother" is outcome determinative. He explains that "[p]arents had not disturbed that arrangement in the seven months that N had been in grandmother's care, and parents each testified that they had no intent to do so. [DHS] presented no evidence to the contrary." Accordingly, father contends, jurisdiction was not warranted.

For its part, DHS acknowledges *A. L.*, but contends that, under ORS 419B.100(2) and two cases applying that subsection, it does not control the outcome here. ORS 419B.100(2) provides, "The court shall have jurisdiction under subsection (1) of this section even though the child

is receiving adequate care from the person having physical custody of the child." In DHS's view, the effect of that provision is that, if a parent's conduct would cause a risk to a child in the parent's custody, then the juvenile court may take jurisdiction over any child of that parent, even if the child is under the care of someone else and is not at risk of harm. Here, DHS asserts, "the record of parents' activities is sufficient to support jurisdiction regardless of [grandmother's] care."

We begin by noting that, in *A. L.*, we rejected the view, which DHS expressed during the jurisdictional hearing in this case, that a parent's decision to turn over his or her child to another person *in itself* supports a determination that there is a current threat of harm to the child.[3] In *A. L.*, DHS argued, among other things, that the "parents leaving [the two older children] with the paternal grandparents for long periods of time" in itself contributed to a risk of harm to the children. 268 Or App at 397. In rejecting DHS's arguments, we explained that those arguments "rest on a mistaken assumption that parents cannot give custody of their children to people who are not DHS-certified." *Id.* at 400. Implicit in our rejection of DHS's assumption is the premise that a parent's decision to allow a responsible person to care for his or her child for the long term, and to allow the child to become bonded to that other person with a "parent-child bond," does not, in itself, provide support for a juvenile court's decision to assert jurisdiction over the child.

We also disagree with DHS that, in cases like this one, where someone other than a parent is the primary caregiver for a child, ORS 419B.100(2) excuses DHS from showing a nexus between risk-causing conduct—here, parents' conduct—and a risk to the child. To discern the meaning of a statute, we employ the methodology set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), *as modified by State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009), to determine the legislature's intent. We first examine the text of the statute and its context. *Gaines*, 346 Or at 171. We also consider legislative

---

[3] We do not understand the trial court to have relied on that argument in taking jurisdiction over N.

history "where that legislative history appears useful to [our] analysis." *Id.* at 172.

ORS 419B.100(1) provides, with two exceptions not relevant here:

"[T]he juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and:

"(a)   Who is beyond the control of the person's parents, guardian or other person having custody of the person;

"(b)   Whose behavior is such as to endanger the welfare of the person or of others;

"(c)   Whose condition or circumstances are such as to endanger the welfare of the person or of others;

"(d)   Who is dependent for care and support on a public or private child-caring agency that needs the services of the court in planning for the best interest of the person;

"(e)   Whose parents or any other person or persons having custody of the person have:

"(A)   Abandoned the person;

"(B)   Failed to provide the person with the care or education required by law;

"(C)   Subjected the person to cruelty, depravity or unexplained physical injury; or

"(D)   Failed to provide the person with the care, guidance and protection necessary for the physical, mental or emotional well-being of the person;

"(f)   Who has run away from the home of the person;

"(g)   Who has filed a petition for emancipation pursuant to ORS 419B.550 to 419B.558; or

"(h)   Who is subject to an order entered under ORS 419C.411(7)(a)."

Before the juvenile court can assert dependency jurisdiction over a child, it must determine, by a preponderance of the evidence, that the child falls within one of those eight categories. ORS 419B.310(3).

Thus, jurisdiction is proper under ORS 419B.100(1)(c) when a child's "condition or circumstances are such as to endanger the welfare of the" child. A child's welfare is endangered if the child is exposed "to conditions or circumstances that present a current threat of serious loss or injury." *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 61, 308 P3d 307 (2013). "It is the *child's* condition or circumstances that are the focus of the jurisdictional inquiry." *State ex rel Juv. Dept. v. Vanbuskirk*, 202 Or App 401, 405, 122 P3d 116 (2005) (emphasis in original). Because of ORS 419B.100(1)(c)'s focus on the child, DHS must "establish a nexus between the allegedly risk-causing conduct or circumstances and risk of harm to the child, and that the risk of harm is present at the time of the hearing and not merely speculative." *Dept. of Human Services v. E. M.*, 264 Or App 76, 81, 331 P3d 1054 (2014).

As set out above, ORS 419B.100(2) provides, "The court shall have jurisdiction under subsection (1) of this section even though the child is receiving adequate care from the person having physical custody of the child." As noted, DHS contends that, given that provision, we cannot consider grandmother's care of N in deciding whether N's condition and circumstances are such as to endanger her welfare.

That view of ORS 419B.100(2) is incompatible with the text of ORS 419B.100(1). To determine whether a child's condition and circumstances present a current threat of serious loss or injury, as required by ORS 419B.100(1)(c), a court plainly must consider *all* of the child's circumstances, including the circumstance that the child is being cared for by someone other than the parents and the other specific circumstances attendant to that arrangement. *See State ex rel Juv. Dept. v. Smith*, 316 Or 646, 652-53, 853 P2d 282 (1993) (earlier version of ORS 419B.100(1)(c) "require[s] the juvenile court to consider the totality of the circumstances presented in the case before it").[4] To do otherwise

_____

[4] The 1993 Legislative Assembly repealed *former* ORS 419.476 and, in its place, enacted ORS 419B.100. Or Laws 1993, ch 33, §§ 53, 373. ORS 419B.100 has been amended numerous other times. Or Laws 1993, ch 546, § 10; Or Laws 1993, ch 643, § 5; Or Laws 2005, ch 843, § 31; Or Laws 2011, ch 291, § 5; Or Laws 2013 ch 1, § 61. Although the reenactment and some of the subsequent amendments have changed the text of subsections (1) and (2), none of those changes affects our

would change the focus of the inquiry from the condition and circumstances of the child to the circumstances of the parents. That would be inconsistent with the text of ORS 419B.100(1)(c), which directs the inquiry to the condition and circumstances *of the child. See, e.g., Vanbuskirk,* 202 Or App at 405.

Rather, subsection (2) does not negate any part of the requirements of subsection (1)—in this case, the requirement that the child's "condition or circumstances are such as to endanger [the child's] welfare," ORS 419B.100(1)(c). Instead, subsection (2) provides additional information about the breadth of the inquiry under subsection (1): The mere fact that the child is being adequately cared for does not prohibit the court from taking jurisdiction *if one of the requirements of subsection (1) is satisfied.* Accordingly, in considering N's condition and circumstances, we must consider not only the circumstance of N living with grandmother, but also whether, given that arrangement, parents' conduct nevertheless poses a current threat of serious loss or injury to N.

DHS cites *State ex rel Juv. Dept. v. Moyer,* 42 Or App 655, 601 P2d 821 (1979), *rev den,* 288 Or 633 (1980), and *State ex rel Juv. Dept. v. D.,* 55 Or App 912, 640 P2d 660 (1982), in support of its view that it need not show a link between parents' conduct and a risk to N under these circumstances. In *Moyer,* the older of the mother's two children, M, who was four at the time of the hearing, was born while the mother was incarcerated. 42 Or App at 657. Before M was born, the mother "arranged with a friend's mother, Mrs. Stowers, to care for the child and set up a legal guardianship, which continue[s] in effect." *Id.*

On appeal of a judgment that, as relevant here, took jurisdiction over M under subsection (1)(e), we concluded that jurisdiction was proper under that subsection because, "[b]y being unavailable to care for [M], the mother 'failed to provide' for her." *Id.* at 662 (quoting *former* ORS 419.476(1)(e)

---

analysis. Accordingly, throughout our discussion, we refer to "subsection (1)" and "subsection (2)" without distinguishing between *former* ORS 419.476 and ORS 419B.100 and without distinguishing among the versions of ORS 419B.100.

(1977)).[5] Under subsection (2), the fact that the mother had established a legal guardianship "was insufficient to defeat jurisdiction." *Id.* at 661. We explained:

"Subsection (2) was added following the decision in *Sneed v. Sneed*, 230 Or 13, 368 P2d 334 (1962), in which our Supreme Court held that a child in the actual custody of his maternal grandmother, though the mother had legal custody pursuant to a divorce degree, could not be subject to the jurisdiction of the juvenile court where the grandmother was taking adequate care of him. 230 Or at 17-18.[6] While the present case is distinguishable from *Sneed*, we perceive no basis in the statute for holding that the existence of the legal guardianship in addition to actual custody is sufficient as a matter of law to defeat jurisdiction."

*Moyer*, 42 Or App at 661.

Thus, in *Moyer*, we did not hold that subsection (2) excused the juvenile department from showing that the juvenile court had jurisdiction under subsection (1). Instead, we decided that the court had jurisdiction because the mother had "failed to provide" for M, *former* ORS 419.476(1)(e) (1977), by being unavailable to care for her, and the fact that the mother had made arrangements for M's care, and that M was being cared for adequately, did not defeat that jurisdiction. *Moyer*, 42 Or App at 661. Although that holding may not withstand further scrutiny under the current text of ORS 419B.100(1)(e), it is consistent, structurally, at least,

---

[5] At that time, subsection (1)(e) provided jurisdiction over a child when "'[e]ither his parents or any other person having his custody have abandoned him, failed to provide him with the support or education required by law, *** and protection necessary for his physical, mental or emotional well-being ***.'" *Moyer*, 42 Or App at 660 (quoting *former* ORS 419.476(1)(e) (1977)) (omissions in *Moyer*).

The juvenile court had taken jurisdiction over M under both subsection (1)(e) and subsection (1)(c). *Id.* On appeal, as explained in the text, we held that jurisdiction was proper under subsection (1)(e); that conclusion obviated the need to consider whether it was also proper under subsection (1)(c). *Id.* at 662 n 3.

[6] In *Sneed*, the court set out the full text of *former* ORS 429.476(1), which, at that time, listed five bases for jurisdiction, and then observed that, in earlier cases, it had held "that the court cannot assume jurisdiction of a child, pursuant to the above statute, unless the person having the actual physical custody of the child, even though a stranger to the child, has neglected the child." 230 Or at 17. It reiterated, "[T]he statute does not justify declaring a child to be dependent and made a ward of the court when the actual care the child is receiving is adequate and proper." *Id.*

with our understanding of the operation of subsections (1) and (2), explained above, and, in any event, it construes subsection (1)(e), which is not at issue here.

As quoted above, in our analysis of subsection (2) in *Moyer*, we referred to the Supreme Court's opinion in *Sneed*. *Sneed* and its predecessors created an additional, extratextual requirement for dependency jurisdiction under subsection (1): "[T]he person having the actual physical custody of the child, even though a stranger to the child, [must have] neglected the child." *Sneed*, 230 Or at 17. In response to that holding, the legislature enacted subsection (2), which rejected *Sneed*'s extratextual neglect requirement and refocused the courts on the text of subsection (1), which, as explained above, enumerates the bases on which the legislature intended the juvenile court to have jurisdiction. In *Moyer*, we recognized the legislative rejection of *Sneed*'s extratextual neglect requirement and, considering the text of subsection (1)(e), concluded that jurisdiction existed under that subsection because the mother had failed to provide for the child by being unavailable. We did not hold that subsection (2) eliminated the juvenile department's burden of establishing one of the bases of jurisdiction listed in subsection (1). Accordingly, *Moyer* does not persuade us that our reading of the statutory text is incorrect.

We turn to *State ex rel Juv. Dept. v. D.*, the second case on which DHS relies in support of its view that it need not show a link between parents' conduct and a risk to N. In *D.*, the child's father had killed the child's mother and was serving a 17-year indeterminate prison sentence with a five-year minimum. 55 Or App at 914. The father and the juvenile department agreed that the child should live with an aunt and uncle in Arizona, and the father had established a conservatorship fund of $85,000 for the child. *Id.* The father contended, however, that the juvenile court should not take jurisdiction once those arrangements were made. *Id.*

On appeal of a judgment taking jurisdiction, we noted that "[j]urisdiction was *not* based on lack of parental care or on parental failure to provide under ORS 419.476 (1)(e)," but we did not specify any ground in subsection (1) upon which the juvenile court did base its jurisdiction.

*Id.* (emphasis in original). After noting that the father had made arrangements for the child while he was incarcerated, we reasoned as follows:

> "The fact remained, however, that [the father] would be incarcerated for an indefinite period and would be unable to supervise and ensure those arrangements. The child is too young to protect herself or to assist in her own care. Her circumstances are such that she needs someone to supervise and ensure the arrangements for her care. The legislature intended the state to have that role. [Subsection] (2) confers jurisdiction 'even though the child is receiving adequate care from the person having [her] physical custody.' *See State ex rel Juv. Dept. v. Moyer,* 42 Or App 655, 601 P2d 821 (1979), *rev den,* 288 Or 633 (1980) (legal guardianship, established to care for child while mother incarcerated, in addition to actual custody, did not defeat jurisdiction)."

*D.,* 55 Or App at 914-15.

Thus, we noted that jurisdiction was not based on the parent's failure to provide for the child, as it was in *Moyer,* but then reasoned that the father's inability to "supervise and ensure [the] arrangements" that he had made for the child nevertheless allowed the juvenile court to take jurisdiction. *Id.* at 914. In doing so, we stated that "[subsection] (2) *confers jurisdiction* 'even though the child is receiving adequate care from the person having [her] physical custody.'" *Id.* at 915 (emphasis added).

DHS is correct that our reasoning in *D.* supports its view that, when a child is being cared for by someone other than a parent, DHS need not show that one of the bases for jurisdiction in subsection (1) is satisfied. Indeed, under our reasoning in *D.,* subsection (2) entirely negates subsection (1); the juvenile court has jurisdiction *whenever* a "child is receiving adequate care from the person having [her] physical custody," if that person is not her parent. *Id.* No consideration of any basis for jurisdiction under subsection (1) is necessary, as demonstrated by the fact that, in *D.,* we did not state whether any basis for jurisdiction specified in subsection (1) applied.

However, that reasoning is plainly wrong; it is inconsistent with the text and structure of subsections (1) and (2).

As we have explained, subsection (1) sets out the bases for jurisdiction, and the court may not take jurisdiction absent proof that one of those bases applies. ORS 419B.310(3) ("The facts alleged in the petition showing the child to be within the jurisdiction of the court *as provided in ORS 419B.100(1)*, unless admitted, must be established by a preponderance of competent evidence." (Emphasis added.)). If, as we reasoned in *D.*, subsection (2) "confer[red] jurisdiction" whenever a child was not in the care of a parent but nevertheless was receiving adequate physical care, subsection (2) would be an additional, independent basis for jurisdiction; it would belong in subsection (1), not in its own subsection. Its placement in its own subsection, rather than as an additional enumerated basis for jurisdiction in subsection (1), demonstrates that the legislature did not intend it to provide such an independent basis for juvenile court jurisdiction.

The text of subsection (2) confirms that conclusion. It provides, "The court shall have jurisdiction *under subsection (1) of this section* even though the child is receiving adequate care from the person having physical custody of the child." ORS 419B.100(2) (emphasis added). Thus, subsection (2) expressly recognizes that its application is subject to the prerequisite of "jurisdiction under subsection (1)." It is an additional instruction regarding the scope of the inquiry under subsection (1), not an independent basis for jurisdiction.

Because our decision in *D.* was plainly wrong, we now overrule it. After considering the legislative history of ORS 419B.100(2) that the parties have proffered, we conclude that it does not add anything of value to our analysis. *See Gaines*, 346 Or at 170 (the value of proffered legislative history "is for the court to determine"). As explained above, 271 Or App at 369, subsection (2) was enacted in response to the Supreme Court's decision in *Sneed*, and its intended function was to reject the judicially created categorical rule that a juvenile court could not take jurisdiction over a child who was receiving adequate physical care from "[t]he person having the actual physical custody of the child, even though a stranger to the child." *Sneed*, 230 Or at 17. Thus, to analyze whether the juvenile court has jurisdiction, we

apply the text of the relevant basis for jurisdiction in subsection (1), keeping in mind that the legislature did not intend to categorically preclude jurisdiction whenever the child is receiving adequate physical care.

As to subsection (1)(c), then, the relevant inquiry remains "whether * * * the evidence in the record, as a whole, establishe[s] that the totality of the child[]'s circumstances or conditions exposed [the child] to a current risk of serious loss or injury that was reasonably likely to be realized." *A. L.*, 268 Or App at 398. The effect of ORS 419B.100(2) on that inquiry is that the mere fact that a child is being adequately cared for by a nonparent does not prohibit the court from taking jurisdiction, as long as the totality of the child's circumstances expose the child to a current risk of serious loss or injury. Here, then, DHS had the burden of alleging and proving that parents' conduct posed a risk of serious loss or injury to N despite the fact that grandmother was caring for N.

DHS could have pursued that theory of jurisdiction below. Had DHS done so, it could have presented evidence indicating that parents would take primary caregiving responsibilities back from grandmother; for example, DHS could have ascertained whether parents intended to parent N if they moved in with grandmother, or whether parents would have continued allowing grandmother and aunt to care for N even if they all lived under one roof. Or DHS might have argued that parents' mere presence in grandmother's household would have presented a threat to N even if parents did not take over primary caregiving responsibilities. But DHS did not.[7]

In taking jurisdiction over N, the juvenile court decided that "the substance abuse issues and the judgment issues * * * involving K extend to N, because those parenting decisions are going to be made for both children." In the

_____

[7] In particular, neither DHS nor the juvenile court connected any risk to N with the possibility that parents and the children would all move in with grandmother. As noted above, in closing argument, DHS asserted that, if the children were returned immediately after the hearing, the children would go home with grandmother and parents would go elsewhere. Nor did DHS or the juvenile court connect any risk to N with the fact that, according to grandmother, parents occasionally took care of N for several hours at a time.

context of all of the court's findings, which do not identify or hint at any specific way in which parents' risk-causing conduct might have affected N, and DHS's failure to identify any such nexus, we understand the court's decision to be based on a speculative belief that, as long as parents had legal custody of N, they might remove her from grandmother's care, at which point she would be exposed to parents' bad judgment and substance abuse issues. That is not sufficient to support the conclusion that there is a current risk of harm. *See Dept. of Human Services v. B. L. J.*, 246 Or App 767, 774, 268 P3d 696 (2011) (rejecting DHS's argument that, "even if the children will not be at risk in Bingham's house, mother [and the children] might leave Bingham's house," because there was no evidence demonstrating "that it is reasonably likely that mother will leave her current supportive environment").

Reversed.