Argued and submitted September 29, reversed November 30, 2016

In the Matter of K. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. C.
and A. S.,
*Appellants.*

Klamath County Circuit Court
15JU07303; A162033

387 P3d 476

Ginger Fitch argued the cause and filed the brief for appellant A. S.

Tiffany Keast argued the cause for appellant K. C. With her on the brief was Law Office of Tiffany C. Keast, LLC.

Inge D. Wells, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Egan, Judge, and Lagesen, Judge.

## ORTEGA, P. J.

In this juvenile dependency appeal, mother and father challenge the juvenile court's judgment asserting jurisdiction over their newborn child, K. ORS 419B.100(1)(c). Parents contend that the Department of Human Services (DHS) failed to establish that, at the time of the jurisdictional hearing, K was under a threat of harm for neglect. Because we agree with parents that the record is insufficient to establish that K's condition or circumstances presented a serious risk of harm, we reverse.

The parties do not request *de novo* review. As such, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We "assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record." *Id.* We present the facts consistently with that standard.

Parents have two children, G and K.[1] The older child, G, was placed in foster care in 2014 due to concerns about parents' mental health and substance abuse issues. In November 2015, while G was still in foster care, mother gave birth to K. At the time, DHS had received a referral indicating that parents' conditions had not been ameliorated. Based on that referral, two DHS caseworkers, Horton and Roberts, went to the hospital and informed parents that K was being taken into protective custody to be placed in foster care. In response, parents told the caseworkers that they had relinquished their parental rights over K to mother's father, grandfather. It turned out that parents had executed a power of attorney, which DHS concluded was insufficient to mitigate its concerns. According to Horton, DHS was concerned that mother, who was living in grandfather's home, would still be parenting on her own or could take K whenever she wanted. That is, DHS did not believe that grandfather would put in place the restrictions or limitations necessary

---

[1] Although we recount facts regarding both children, this appeal addresses the court's jurisdiction only as to K.

to keep K safe. At the time, DHS had not certified grand-father's home as a placement resource.

DHS removed K from parents' care at the hospital and filed a dependency petition. The petition alleged, in part:

"A.   The child, [K], is currently residing under a threat of harm for neglect, to wit:

"1.   The father * * * has a history of involvement with DHS/Child Welfare due to his severe chronic mental health issues, substance abuse issues, and his lack of parenting skills, which resulted in the placement of his older child into foster care. Although [father] has participated in some services offered by DHS/Child Welfare, he has failed to remedy the concerns and his older child has not been returned to his care. This condition places the child, [K], under a threat of harm.

"2.   The mother * * * has a history of involvement with DHS/Child Welfare due to her severe chronic mental health issues, as well as her lack of parenting skills, which resulted in the placement of her older child into foster care. Although [mother] has participated in some services offered by DHS/Child Welfare, she has failed to remedy the concerns and her older child has not been returned to her care. This condition places the child, [K], under a threat of harm."

In December 2015, the court held a shelter hearing and asserted temporary jurisdiction over K. In April 2016, the court held a jurisdictional hearing. At the outset of that hearing, DHS asked the court to take judicial notice of the contested shelter hearing for K, as well as the "jurisdictional hearing and the findings of those permanency hearings and updates that have taken place" related to G's dependency case. Hearing no objections, the court took "judicial notice of the things that were requested." DHS then made the following opening statement:

"Also as a preliminary matter, in anticipation of counsel's arguments, there has been some talk about this plan, there was talk that came up during the contested shelter of a plan to have the child placed with the grandparents. At this time it would be the agency's position that that argument is not relevant; the guardianship was never

brought to fruition and based upon the examination of the grandparents being examined as a placement source and their denial in the other case, the child would not be appropriately placed with them, either. So any comments regarding a potential guardianship, which I understand is going to be determined later this week or next week, would not be relevant to the matter which is before the Court at this time."

In response, parents asserted that information regarding their plan to delegate authority as to K to grandfather was relevant. The court then stated:

"Well, since you asked the Court to take judicial notice of all previous proceedings, the Court recalls testimony that the grandfather and grandmother were looked into as a potential placement for the older child and that it was not an approved placement. Perhaps * * * you could refresh the Court's memory with testimony on that issue."

DHS responded that it intended to do so.

During the hearing, DHS presented testimony from various service providers and caseworkers regarding parents' mental health and parenting skills. Dr. Sweet, the psychologist who evaluated father and mother in 2014 and 2015, respectively, noted that parents have significant mental health issues. Sweet diagnosed father with schizophrenia, obsessive compulsive disorder, anxiety disorder, cannabis use disorder, and methamphetamine use disorder. Sweet also expressed concern about father's "low level of cognitive conceptual and communication functioning" and opined at the hearing that "there was no way that [father] could successfully provide for a child's developmental needs" without making significant progress, although he acknowledged that he had not seen father in several months and could not speak to whether he had made such progress. As to mother, Sweet testified that he diagnosed her with schizophrenia and an adjustment disorder with depressed mood. He also described her as having borderline intellectual functioning, with some indicators of neurological dysfunction. Sweet opined that mother was "significantly impaired" and that he was concerned about "her ability just to function on her own." He noted that mother previously had been committed to the state hospital and would need medication and counseling

to address her psychosis and depression. However, as with father, Sweet had not met with mother in several months.

Several DHS witnesses who had observed parents' visits with K testified that, although parents displayed minimal engagement during visits, they functioned adequately and had made some progress. Vangastel, the social services assistant (SSA) with the longest history of observing the family's visits, stated that mother displayed more verbal and physical interaction with K than she ever had with G. When describing mother's visits with K, Vangastel stated that mother "holds him the whole time, she verbally interacts with him, she attends to his needs * * *. She will give [K] the bottle if he fusses." As to father, Vangastel indicated that, during their last visit, father prepared a bottle for K, fed him and burped him, and also kept any eye out for the older child. Vangastel clarified, however, that despite noticeable improvements, she would not be comfortable with unsupervised contact between parents and K. Other providers who testified at the hearing made similar visit observations and agreed that whatever progress parents had made was insufficient to eliminate their safety concerns.

On the issue of grandfather's involvement and potential role in parenting K, D'Olivo, the DHS foster home certifier, testified that grandfather had originally applied to be a placement resource for G but that, because his application was still pending when K was born, she considered his application for both children. She stated that DHS sent grandfather a denial notice in December 2015 because, among other reasons, mother was living in his home. She did not elaborate on that point or say what the other reasons for the denial were.

DHS argued in closing that

"the parents have made some progress in their services but not enough to be able to parent safely without the assistance of the agency. * * *

"Thus, as far as the allegations are concerned, the agency has proved its case and I would ask that the Court take jurisdiction, and also I'm relying upon the record that you took under judicial notice at our request previously."

Anticipating parents' arguments regarding grandfather's involvement, DHS then stated:

"In this case, the placement [re]source that was put forth, namely the grandfather, mom is still staying with him. There is no evidence whatsoever that there was a safety plan in place and none was presented to the agency. Also, another big difference was that in process with the older child the agency was evaluating the father, the grandfather in this case, * * * as a potential placement for the older child. He was in the process of being rejected, one of the main reasons being that mom still lives with him but there are other factors as well that we did not get into due to the confidentiality issues, et cetera, but there were several factors that went into that."

Father, in turn, asserted that DHS had not proved its case and that the court could not "base jurisdiction on its belief of what would happen if the child were placed[] [with] * * * grandfather." Relying on *Dept. of Human Services v. A. L.*, 268 Or App 391, 342 P3d 174 (2015), and *Dept. of Human Services v. A. B.*, 271 Or App 354, 350 P3d 558 (2015), father argued that there was no evidence in the record to indicate that child would be in danger under grandfather's care. According to father, DHS was required to connect how mother living in grandfather's home presented a risk of harm to K. Father noted that DHS did not present evidence as to the concerns that led the agency to decline certification and clarified that it was not his burden to introduce evidence about that process.

Mother reiterated father's argument, stating:

"[T]here was a plethora of evidence presented detailing the parents' deficiencies and deficits, but there was really no testimony or evidence presented as to how grandfather presented as a current threat of harm for serious loss or injury. There was concerns raised, but that is not in evidence as to his current circumstances or condition."

Having heard arguments from all parties, the court made findings of fact on the record. The court stated:

"So I rely on the facts that we heard at the permanency hearing in relation to [G], in addition to the things that we talked about in this hearing because, of course, they

asked me to take judicial notice and so that is the case. And I remember that they at that time were working with [grandfather] to see if they could certify his home as a placement for [G] and that ultimately did not work out; I don't know why. I know one of the reasons was because mom lived in the house and that [he], as I recall, didn't appreciate the seriousness of her problems and that they were afraid, one of the things was that they were afraid he would have a tendency to leave her unattended with the child. I just, that's what I'm remembering from the testimony at that hearing."

The court then noted, "[P]arents at this point are not a resource for this child, even they agree that they are not a resource at this time for this child, so the agency is required to look for a relative placement right now."

After the court announced that it was asserting jurisdiction over K, father asked the court "to verbalize for the record * * * its findings in terms of the nexus or what the agency has proven that shows a reasonable risk that maternal grandfather's care would create a reasonable likelihood of harm other than that he's not DHS certified[.]" The court responded:

"[A]s I recall, one of the concerns was that he didn't appreciate the challenges mom had and that he—as I recall they testified that he might be likely to leave the child unattended with the mom."

The court added:

"I remember this from the last hearing is what I'm relying on. *And that may be that things have changed,* but that's the evidence I have to rely on from the last hearing."

(Emphasis added.)

Father followed up, "And just to be clear for the record, you're basing that on DHS's belief that he would do that but not, but you're not basing it on any evidence that that has happened?" The court simply responded that it was "recalling it from the last hearing." DHS added, "And so also since counsel's asking * * * our concern would be that the mother's mere presence in the home would be a risk to that child because of the 24/7 access in conjunction with the

grandfather not seeing her as a risk." Father responded that such claims would be speculative.

On appeal, mother and father reprise their arguments made below. In challenging jurisdiction, parents do not contend that they would have been able to independently and safely parent K at the time of the jurisdictional hearing; rather, parents argue that DHS failed to establish that K would have been at risk of harm if, as they intended, grandfather was entrusted with his care.[2] Mother also assigns error to the court's reasonable efforts finding. DHS, in turn, contends that parents' plan to have grandfather care for K was insufficient to ameliorate the risk of harm posed by their mental illness, given that mother lived in grandfather's home and grandfather did not appreciate the severity of her mental illness. It also argues that the power of attorney documents executed by parents were revocable and therefore did not provide any protection if parents were to remove K from grandfather's home.

We have previously made clear that, under

"ORS 419B.100(1)(c), a juvenile court may assert jurisdiction in a dependency case when a child's condition or circumstances are such as to endanger the welfare of the child. A child is endangered if the child is exposed to conditions or circumstances that present a current threat of serious loss or injury. DHS has the burden to prove that the threat is current and nonspeculative; it is not sufficient for the state to prove that the child's welfare was endangered sometime in the past. Rather, there must be a reasonable likelihood that the threat will be realized."

*A. L.*, 268 Or App at 397 (internal quotation marks and citations omitted).

---

[2] At oral argument, father also raised the issue of the juvenile court taking judicial notice and relying on its recollection of prior court proceedings concerning this family. We do not address that issue, as father neither properly assigned error to it nor preserved it for review. Furthermore, after reviewing the record, it is evident that, to the extent that the court relied on judicially noticed facts or its recollection of prior proceedings, that evidence was echoed by the caseworkers' testimony at the jurisdictional hearing. In particular, the court recalled that DHS had concerns that grandfather did not appreciate mother's challenges and that he might be likely to leave K unattended—concerns that were echoed in the testimony of Horton and D'Olivo at the hearing. That is, there is no indication that the court relied on evidence that was not introduced at jurisdictional hearing regarding K.

Pertinent to this case, to establish jurisdiction over a child, DHS must present evidence that permits a determination that, absent juvenile court jurisdiction, the child's current circumstances pose the requisite nonspeculative risk to the child. *See Dept. of Human Services v. M. Q.*, 253 Or App 776, 787, 292 P3d 616 (2012). Jurisdiction "cannot be based on speculation that a parent's past problems persist at the time of the jurisdictional hearing in the absence of any evidence that the risk, in fact, remains." *Id.* In addition, proof that parents' current conditions are such that they are unable to parent independently at the time of the jurisdictional hearing, standing alone, also is insufficient to establish juvenile court jurisdiction. *Dept. of Human Services v. B. L. J.*, 246 Or App 767, 773-74, 268 P3d 696 (2011) ("there is no legal requirement that a parent be able to care for his or her children independently"). DHS must also prove that the inability to parent independently, in fact, poses the requisite risk of harm to the child under the circumstances in which the child will be living absent juvenile court jurisdiction. In other words, when DHS seeks to establish that jurisdiction is warranted because of the parents' inability to parent on their own, DHS must also establish that the parents will, in fact, be parenting on their own, or that, for some other reason, the parents' deficits pose a current risk of harm to the child under the child's actual circumstances.

Under those standards, the evidence in this case is legally insufficient for two reasons. First, DHS presented insufficient evidence that would support a finding as to what parents' circumstances were at the time of the hearing and, thus, it is not inferable that, as of the time of the hearing, absent juvenile court jurisdiction, K faced a current risk of harm. Although there is evidence to conclude that parents suffered from mental illness, the record contains few details about the severity or the manifestations of parents' mental health conditions at the time of the hearing. As to father, although the record includes Sweet's testimony that father also had problems with substance abuse, nothing in the record indicates the extent to which those past problems posed a risk of harm to K at the time of the jurisdictional hearing. The dependency petition alleged that father's substance abuse had not been ameliorated; however, there is

nothing in the record to substantiate that claim. Further, even if we were to assume that father's substance abuse problems persisted, the record does not indicate whether or how his substance abuse affected K. *See Dept. of Human Services v. E. M.*, 264 Or App 76, 83, 331 P3d 1054 (2014) ("[A] parent's substance abuse alone does not create a risk of harm to a child.").

Second, the evidence presented at the jurisdictional hearing, at most, permits a finding that parents could not safely parent K on their own. But DHS did not present evidence establishing *how* that deficit would pose a risk to K under K's circumstances. It did not present evidence that would permit a finding that parents would, in fact, be parenting on their own, or that, in view of K's actual home circumstances, absent juvenile court jurisdiction, those deficits in parents' abilities posed a nonspeculative risk to K. Indeed, if anything, the record tends to suggest that parents would be parenting with the assistance of maternal grandfather, and contains nothing that tends to suggest that parents' deficits would pose a risk to K if those, in fact, were K's circumstances.

Specifically, although the record very clearly indicates that DHS had concerns about the potential risk of harm to K if left in grandfather's care, none of the witnesses who testified at the hearing elaborated on that point. That is, DHS's concern that grandfather would not put in place restrictions or limitations necessary to keep K safe with parents in the home is not supported by any evidence in the record and is mere speculation. For instance, the mere fact that mother would be present in the home does not speak to how that might affect K or his safety while in grandfather's care, in part, because the record does not contain sufficient details about mother's current condition.

Further, there is no evidence to support DHS's concern that grandfather did not appreciate the severity of mother's illness or that he was likely to leave K with mother unattended. The record contains no testimony from grandfather or anyone else as to his actual understanding of mother's mental illness, nor does it contain evidence to support a finding that grandfather previously had left K (or G)

unattended with mother or was likely to do so. There also is no information about grandfather's home or current circumstances.[3] Notably, the court acknowledged that it did not know whether DHS's concerns about grandfather persisted at the time of the jurisdictional hearing (noting that "things [may] have changed, but that's the evidence I have to rely on from the last hearing"). Thus, the most that we can conclude from the record is that DHS, at some point, had concerns about grandfather caring for K.

Finally, DHS's argument that the power of attorney did not assure K's safety because parents could decide to remove K from grandfather's care is also unavailing. It was DHS's burden to demonstrate that the risk-causing conduct—here, parents' conduct—posed a *current* risk of harm to K under the totality of K's circumstances, and there is no evidence in the record to suggest that either parent intended to or was reasonably likely to remove K from grandfather's care. We have previously acknowledged that "there may be cases in which a parent's past conduct provides a basis for concluding that it is reasonably likely that the parent will change his or her children's circumstances to their detriment"; however, we have indicated that, to establish such a likelihood, there must be evidence from which we can infer that the parent is reasonably likely to remove the child from a safe environment. *B. L. J.*, 246 Or App at 774; *see also A. B.*, 271 Or App at 373 (the court's speculative belief that the parents might remove the child from grandmother's care was insufficient to establish a current risk of harm). The record in this case does not support that inference.

Accordingly, DHS failed to carry its burden to demonstrate that, in the totality of K's circumstances, parents' risk-causing conduct posed a current risk of serious loss or injury.[4]

Reversed.

---

[3] Horton, the DHS caseworker who removed K from parents' care, and Deese, the caseworker assigned to K's case at the time of the jurisdictional hearing, testified that they had not visited grandfather's home, and there is no indication in the record that anyone else had done so.

[4] Given our disposition, we do not address mother's reasonable efforts argument.