Submitted November 8, 2019, affirmed January 29, 2020

In the Matter of I. T. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

F. Y. D., JR.,
*Appellant.*

Lane County Circuit Court
18JU09845; A171156

457 P3d 947

Father appeals the juvenile court's judgment establishing jurisdiction over child, arguing that, because his sister was available to care for child while father served about four to five more months of incarceration, DHS failed to present sufficient evidence of a current threat of harm to child. *Held*: Because father entrusted child to his sister for only the few months that he would be in prison, the juvenile court did not err in taking jurisdiction based on its finding that it was likely that father would assume his parental responsibilities when released and that that posed a risk of harm to child given father's poor judgment and decision making.

Affirmed.

Jay A. McAlpin, Judge.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Holly Telerant, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and E. Nani Apo, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

ARMSTRONG, P. J.

Affirmed.

**ARMSTRONG, P. J.**

In this juvenile dependency case, father appeals the juvenile court's judgment establishing jurisdiction over T. After an incident in which T nearly died when father violated a no-contact order and allowed T to come into unsupervised contact with mother, who gave T methadone to help him sleep, the Department of Human Services (DHS or the department) alleged against father three grounds for jurisdiction that were additional to the basis for jurisdiction established in a separate case.[1] The juvenile court established jurisdiction under ORS 419B.100(1)(c) on the basis that the conduct alleged by DHS as additional grounds for jurisdiction exposed T to a threat of serious loss or injury that was likely to be realized in the absence of juvenile court jurisdiction. Father challenges the court's denial of his motion to dismiss those alleged grounds for jurisdiction, arguing that, because his sister—T's aunt—was available to care for T while father served about four to five more months of incarceration, DHS failed to present sufficient evidence of a current threat of harm to T. DHS responds in the main that father failed to preserve his argument that the availability of T's aunt as a primary caregiver meant that there was not a current risk of harm, and, in any event, asserts that the record supports the juvenile court's determination.[2]

For the reasons explained below, we conclude that father did preserve his argument that the availability of his sister as a primary caregiver while he was in prison meant that there was no current risk of harm to T, but that, nevertheless, because father entrusted T to his sister for only the few months that he would be in prison, the juvenile court did not err in taking jurisdiction based on its finding that it was likely that father would assume his parental responsibilities

---

[1] Mother admitted the two allegations alleged by DHS as to her—that she exposed T to methadone on several occasions and that her criminal behaviors and attendant consequences interfere with her ability to safely parent T. Mother does not appeal.

[2] The jurisdiction judgment at issue here concerns Case No. 18JU09845. The first petition that resulted in a jurisdictional judgment based on father's admission that he needed the department's help with developing a relationship with T, gaining awareness of T's circumstances, and acting protectively on T's behalf, Case No. 18JU07724, is not at issue on appeal. The juvenile court has since consolidated the two cases.

when released and that that posed a risk of harm to T given father's poor judgment and decision making. We affirm.

## BACKGROUND

Neither party requests that we exercise our discretion to review this case *de novo*, and we decline to do so. ORAP 5.40(8)(c). Consequently, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We state the following facts in in accordance with that standard.

In October 2017, father and mother had a physical altercation, for which father was convicted of fourth-degree assault and strangulation and placed on probation.[3] Two conditions of father's probation were that he not have contact with mother and that he not drink alcohol. Mother gave birth to T in July 2018, unbeknownst to father. T had to stay in the NICU for a week to recover from the effects of *in utero* exposure to methadone. In September 2018, when T was about six or seven weeks old, mother called father's sister, Ivanez, asking if Ivanez would watch T. Ivanez agreed and, when she saw T, observed that something was clearly not right with him and took him to the hospital. Ivanez and T's doctors speculated that T had ingested methadone through mother's breastmilk. Father met Ivanez at the hospital, and Ivanez suggested that father take a paternity test to determine whether he was T's father.

DHS was contacted, placed T in foster care, and filed a dependency petition. Father obtained paternity testing, and the results confirmed that he was T's biological father. In November 2018, the juvenile court took jurisdiction over T, based, as to father, on father's admission that he needed the help of DHS and the court to develop a relationship with T and to protect him. On November 10 or 11, DHS placed T in father's care, designating Ivanez as a safety-service provider, who would check up daily on father and the baby and

---

[3] Father was, at that time, on parole for a federal conviction (conspiracy to possess with intent to distribute 50 grams or more of methamphetamine), for which he had served about six years of imprisonment.

notify the caseworker if she had any concerns. Father was aware that T had methadone in his system when he was born and had been exposed to methadone in September.

Father complied with the probation condition that he have no contact with mother until an incident that occurred shortly after Thanksgiving in 2018. Mother called father and asked him to bring T—who at the time was about four months old—to visit her and her sister, Westfall, for the holidays. Father was hesitant but, wanting T to have a relationship with mother, relented, believing that he and mother's sister could protect T. That is, father knew that "there's rules and everything" but, because he was a "human being" for wanting to foster the bond between T and mother, father brought T to Westfall's home. While there, father permitted mother to hold T without leaving T alone with mother. Father had brought two or three beers to Westfall's home and drank them during dinner and a movie; mother's sister persuaded father to stay the night. Father and mother slept on the floor with T in a car seat between them. Father fell asleep; he was eventually awakened by someone screaming that T was not breathing. Father saw that T was out of his car seat, bluish in color, and had difficulty breathing. Father immediately began to administer CPR to T and yelled for mother or Westfall to call 9-1-1. At some point, mother fled Westfall's home and then communicated to Westfall that she had given T methadone. Father continued CPR until emergency responders took over and administered Narcan, which improved T's condition, and father rode with T to the hospital.

At the hospital, T was given more Narcan, and his condition became stable. While at the hospital, father was observed to be loving, caring, and attentive. When father's probation officer learned of the incident, he arrested father for violating the terms of his probation, namely, that he not drink alcohol or have any contact with mother. Father was placed in custody, and T was returned to the foster-care placement that he had been in before he had been placed with father. Mother was also arrested, and she was eventually sentenced to 40 months' incarceration for convictions of causing another person to ingest methadone and third-degree assault. DHS filed the petition at issue in this appeal,

alleging additional bases for the court's jurisdiction—that father's criminal behaviors and attendant consequences interfere with his ability to safely parent T, that father failed to comply with his probation requirements, including having no contact with mother, which presents a threat of harm to T, and that father permitted T to have unsupervised contact with mother despite the department's directives.[4]

At the jurisdictional hearing in April 2019, father indicated that he would be released from custody in September of that year. He also testified that he had executed a power of attorney to Ivanez for T, because he wanted T to be with his family, his sister specifically, whom father described as trustworthy and someone who had always been involved in T's life. Father expressed his desire for Ivanez to be a custodial resource for T "while [he was] locked up" and that he would not be in prison for a long time. Further, father responded "Yes" when asked if the purpose of the power of attorney was that, "just in case the state DHS child welfare case were to go away, you would have a placement for your son with your sister?" Father's attorney introduced into evidence the document by which father conferred power of attorney—for a six-month period of time from April 4, 2019—to Ivanez to exercise his parental rights as to T regarding the care and custody of T, including decisions about childcare and medical care. Father also testified that it was his understanding that Ivanez was certified by DHS as a foster parent.

Ivanez also testified. Ivanez was certified by DHS as a foster parent for her two nephews, and father's attorney moved to introduce the certification into evidence. When DHS objected to the certification as not relevant, the court overruled the objection based on father's attorney's statement that he would be arguing that father "has an appropriate relative [who] could temporarily take care of his son, and this goes to that, and I think it would undercut any of the State's arguments to that end." Ivanez went on to say, both on direct and cross-examination, that she was willing to take care of T on a temporary and permanent basis.

---

[4] The court dismissed DHS's allegation that father "fails to recognize the mother's neglectful behaviors as a threat of harm to the child."

Ivanez was willing to "be there like a mother for him," "forever" if necessary. At one point, T's attorney asked Ivanez what she would do if father were released "tomorrow" and revoked the power of attorney, and Ivanez replied that she did not know what she would do and that she trusted father with T.

Faughnan, a DHS caseworker, testified that father and father's family had been advocating for a relative placement and that DHS was in the process of certifying Ivanez and Ivanez's daughter but that, "at this point in time we didn't want to move the baby, just for the least amount of disruptions. This kiddo was going through withdrawals at the time and the foster family had already known the baby's schedule, was able to figure out he wasn't sleeping well at night ***." Aside from the disruption, Faughnan did not have concerns about placement with father's family and she indicated that family members were possible long-term resources for T. When the juvenile court asked the department's attorney why that was relevant, the attorney answered that she believed that "father's defense is that there is a viable in-home plan."

At the close of the jurisdictional hearing, DHS acknowledged that the hearing was "not about parenting skills" and that a number of witnesses had testified that father was a great father to T and had acted heroically in saving T's life. DHS, however, pointed out that T's life would not have needed saving had father not made the improvident decision to bring T into contact with mother, knowing how dangerous mother was.

Father argued that DHS had not met its burden of showing "a harm that's current and not speculative" and that

"*incarceration,* per se*, does not present a threat of harm to a child, especially if a parent has a safe and appropriate relative to care for the child on a temporary basis.*

"What is the current threat of harm as of today, April 26th? The only barrier to [father] being a parent is his incarceration and I think it's undisputed at this point, that he is going to be released later this year. The true threat of harm to this child is the mother, however, that threat of

harm no long exists. The mother, in this case, is going to be incarcerated for a substantial period of time.

"And so, as I indicated before, [father] is going to be out later this year and the state's case is mostly based upon the mother's conduct, and thus, [father's] state of mind, his protective capacity."

(Emphasis added.)

DHS replied that,

"[w]ith respect to the incarceration itself being not, *per se*, a threat of harm. No evidence—compelling evidence was presented to this Court that there is a better plan for keeping this child safe at this time.

"When you heard from Ms. Ivanez, she indicated that her brother is going to be getting out. She did not know what he would do—what she would do if he revoked the Power of Attorney, and that, 'I trust him with the child.'"

The juvenile court agreed with DHS, ruling:

"So, I find the State's met their burden of proof, on Allegations 4-D, 4-E, as amended, and 4-F. This is in a—in a nutshell, this is a parenting judgment case. I don't question [father's] sense of duty to step up as a father. Nor do I question his motivation, really, to do it. I just think he has exercised very, very, poor judgment and I think his testimony indicates that he, without assistance, is likely to exercise poor judgment again in the future.

"I think the criminal behavior and its intended consequences are covered by the conviction and the probation violation, and being not available and subject to disappearing from [T]'s life at any given second. I think the unsupervised contact with the mother, the portion of that testimony that struck me, was when he was testifying ***.

"He knew he shouldn't have taken [T] to his mother—to [T]'s mother's house on Thanksgiving. I—my impression of his testimony from earlier, was that he felt a lot of pressures, pressure from the child's mother, maybe pressure about what he thought was the right way to act, he indicated, based on his family background and the importance that they put on mothers, but that he knew he shouldn't have done it.

"But then once he did it, he compounded that by not only allowing her to have contact, putting his probation at risk and putting [T] at risk, but he wasn't supervising [T] the entire time and he wasn't in his best frame of mind to be supervising [T].

"He consumed alcohol in violation of his probation, he went to sleep. Even if he truly, a hundred percent believed that the earlier methadone poisoning was an ingestion situation, he left [T] opened up to that.

"* * * * *

"I mean, there's just all sorts of different threats that a protective parent needs to imagine to avoid their children getting in danger and he imagined and failed to imagine some. And regardless of all that, acted in such a way that put [T] in danger. And, that combined with, this kind of, falling back on—'If it's not happening right in front of me, I don't know about it,' I think is an ongoing safety risk and justifies jurisdiction.

"Nowhere in there had I considered that he is not available to parent right now, in fact, I think my analysis should be that he is going to be available to parent and proceed accordingly with that.

"*His release time is coming soon and I think the reality is that it is his desire to parent, and that as soon as he's released, if this was worked as an informal family plan, that he would be right back in that responsible supervisory role, which I think is a threat of harm to [T].*"

(Emphasis added.)

## PRESERVATION

On appeal, father argues that the availability of his sister as the primary caregiver while he was in prison is dispositive as to the department's failure to prove that T was exposed to a current, nonspeculative threat of serious loss or injury. DHS contends that that is a new argument on appeal. In the department's view, father merely argued to the juvenile court that DHS had failed to prove a nexus between father's conduct and a risk of harm to T because the only threat to T was T's mother, who could not harm him

while incarcerated.[5] Further, DHS argues, the juvenile court "based its determination on the safety threat that would be present once father was released from prison and resumed his parenting responsibilities, not on whether [T] would be safe with his paternal aunt in the meantime." Because father failed to "object to the juvenile court's consideration of the threat that would exist at the time of father's release, as opposed to considering whether T would be safe with aunt until then," DHS contends that father failed to preserve the argument that he now raises on appeal.

Generally, we will not consider claims of error that were not raised in the trial court. *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000); ORAP 5.45(1). As explained by the Supreme Court in *State v. Walker*, 350 Or 540, 548, 258 P3d 1228 (2011), there are important policies that support the preservation rule: The rule "gives a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal," *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008), and, "the rule ensures fairness to opposing parties, by requiring that 'the positions of the parties are presented clearly to the initial tribunal' so that 'parties are not taken by surprise, misled, or denied opportunities to meet an argument,'" *Walker*, 350 Or at 548 (quoting *Davis v. O'Brien*, 320 Or 729, 737, 891 P2d 1307 (1995)). "Ultimately, the preservation rule is a practical one, and close calls *** inevitably will turn on whether, given the particular record of a case, the court concludes that the policies underlying the rule have been sufficiently served." *State v. Parkins*, 346 Or 333, 341, 211 P3d 262 (2009).

The record in this case indicates throughout that father's defense included his plan to have his sister act as T's primary caregiver while he was in prison. First, when father made his closing argument to the juvenile court, he asserted "that incarceration, *per se*, does not present a threat of harm to a child, especially if a parent has a safe and appropriate relative to care for the child on a temporary basis." Second, father introduced into evidence documents indicating that

---

[5] On appeal, father does not reprise his argument that, because mother is in prison, DHS failed to prove a nonspeculative current risk of harm to T.

father had legally entrusted the primary care of T to Ivanez and that Ivanez had been certified by DHS as a foster parent. Third, the court heard father's argument—that he "has an appropriate relative [who] could temporarily take care of his son, [which] would undercut any of the State's arguments to that end"—when it overruled the department's objection to admitting the foster-care-certification exhibit. Fourth, much of Ivanez's testimony was of her desire, willingness, and fitness to be a primary caregiver to T. Fifth, both father and Ivanez testified that that they had come to an arrangement in which Ivanez agreed to be T's primary caregiver while father was incarcerated. Sixth, T's DHS caseworker testified to Ivanez's fitness as a caregiver for T. And, finally, when the juvenile court questioned the relevance of Ivanez's caregiving fitness, DHS explained to the court that it was "father's defense * * * that there is a viable in-home plan."

Given that record, it is evident that both DHS and the juvenile court understood that a primary theme of father's defense was that, because father had entrusted T's care to his sister while he was incarcerated, DHS was unable to meet its burden of proving that the circumstances alleged in its petition exposed T to a current risk of serious loss or injury. That is, father argued to the court that, when a parent is incarcerated and "a safe and appropriate relative to care for the child on a temporary basis" is available, jurisdiction is not warranted, and the testimony and other evidence about Ivanez as the entrusted family and primary caregiver for T, and the discussions with the court about the relevance of the evidence during the course of the hearing, informed that argument so that it was understood that that relative was Ivanez while father was in prison. Further, we reject the department's argument that father's failure to object to the juvenile court's rationale for why it took jurisdiction on the grounds alleged by DHS means that father failed to preserve his appellate argument. That is because, "[o]nce a court has ruled, a party is generally not obligated to renew his or her contentions in order to preserve them for the purposes of appeal." *Walker*, 350 Or at 550. Even so, we understand the juvenile court to have recognized that Ivanez was a suitable family placement but that, *nevertheless*, the placement was short term; it was likely that, when

released, father would resume primary parenting responsibilities for T; and that father's judgment was too questionable for that to happen without the assistance of DHS.

Consequently, we conclude that father preserved his argument that a relative—Ivanez—was a close family member to whom he had entrusted T's primary care, which therefore ameliorated a current risk of harm to T. With that established, the argument that father raises on appeal, *viz.*, that the department's failure to prove that T would be exposed to a current, nonspeculative threat in father's sister's care, is dispositive and requires reversal.

## CURRENT RISK OF HARM

ORS 419B.100(1)(c) provides that a juvenile court has jurisdiction in a dependency case when a child's "condition or circumstances are such as to endanger the welfare" of the child. A child is endangered if the child is exposed to conditions or circumstances that "present a current threat of serious loss or injury." *Dept. of Human Services v. A. L.*, 268 Or App 391, 397, 342 P3d 174 (2015). The burden of proof rests with DHS to establish that the threat is current and nonspeculative. Importantly, "it is not sufficient for the state to prove that the child's welfare was endangered sometime in the past." *Dept. of Human Services v. M. Q.*, 253 Or App 776, 785, 292 P3d 616 (2012). And, "there must be a reasonable likelihood that the threat will be realized." *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011). DHS has the additional burden of proving a connection between the allegedly risk-causing conduct and the harm to the children. *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 62, 308 P3d 307 (2013).

Assessing whether the record contains evidence that was legally sufficient to permit the juvenile court to determine that ORS 419B.100(1) had been satisfied, *A. L.*, 268 Or App at 396, we affirm, because the record is sufficient to support the juvenile court's determination that T was endangered and that any risk of harm was current and nonspeculative. The issue in this case merits some discussion of two of our cases that concern the risk of harm to children for the purpose of taking jurisdiction under ORS

419B.100(1)(c) when parents have entrusted their children to family members.

*A. L.* was a dependency jurisdiction proceeding in which there was "clearly sufficient evidence in the record" that the parents abused drugs and lacked the basic parenting skills needed to safely care for their children. 268 Or App at 398. The parents, however, had entrusted the children's care to their grandparents. We said that, given that the parents had entrusted the care of their children to the paternal grandparents, the "question is whether—even assuming that DHS proved those parental deficits—the evidence in the record, as a whole, established that the totality of the children's circumstances or conditions exposed them to a current risk of serious loss or injury that was reasonably likely to be realized." *Id*. DHS asserted that the grandparents' circumstances posed a risk of harm, but we were unpersuaded that the evidence presented by DHS to support that contention was legally sufficient to prove a reasonable likelihood of harm to the children. *Id*. at 400. We concluded, therefore, that, "[b]ecause parents have entrusted the primary care of the children to the paternal grandparents, who do not pose a current threat of harm, the court did not have a basis for asserting jurisdiction over the children." *Id*.

In *Dept. of Human Services v. A. B.*, 271 Or App 354, 356, 350 P3d 558 (2015), the parents had ceded custody of their child, N, to the paternal grandmother. The court acknowledged that N was well cared for by the grandmother but determined that the parents' substance abuse and parenting judgment concerning their other child extended to N, which was sufficient to take jurisdiction over N under ORS 419B.100(1)(c). *Id*. at 362. On appeal, the parents, relying on *A. L.*, contended that entrusting N's care to the grandmother was "outcome determinative" because N had been in the grandmother's uninterrupted care and they had no plans to change that arrangement. DHS, for its part, argued that ORS 419.100(2) ("The court shall have jurisdiction under subsection (1) of this section even though the child is receiving adequate care from the person having physical custody of the child.") rendered *A. L.* inapposite. We rejected that argument.

Instead, we concluded in *A. B.* that the "relevant inquiry remains 'whether * * * the evidence in the record, as a whole, establishe[s] that the totality of the child[]'s circumstances or conditions exposed [the child] to a current risk of serious loss or injury that was reasonable likely to be realized.'" *Id.* at 372 (quoting *A. L.*, 268 Or App at 398). We added, the "effect of ORS 419B.100(2) on that inquiry is that the mere fact that a child is being adequately cared for by a nonparent does not prohibit the court from taking jurisdiction, as long as the totality of the child's circumstances expose the child to a current risk of serious loss or injury." *Id.* Therefore, DHS had "the burden of alleging and proving that parents' conduct posed a risk of serious loss or injury to N despite the fact that grandmother was caring for N." Because DHS had failed to pursue that jurisdictional theory below by presenting "evidence indicating that parents would take primary caregiving responsibilities back from grandmother," we reversed the juvenile court's decision based on the court's "speculative belief that, as long as parents had legal custody of N, they might remove her from grandmother's care, at which point she would be exposed to parents' bad judgment and substance abuse issues." *Id.* at 372-73.

In this case, it is undisputed that father would be released from prison about four or five months from the time of the jurisdiction hearing, and evidence in the record supports the juvenile court's finding that, once father was released from prison, he would resume primary parenting responsibilities of T. *See N. P.*, 257 Or App at 640 (explaining that we neither "substitute our assessment of the persuasiveness of the evidence for the juvenile court's" nor "revisit the juvenile court's resolution of factual disputes or its choice among reasonable inferences"). The power of attorney conferred caregiving responsibilities to Ivanez only until early October 2019, shortly after father's September prison-release date. Although Ivanez expressed her willingness to be a permanent caregiving resource for T, that is not evidence that it was father's plan to entrust T's caregiving to her on a long-term basis. Rather, father expressed his preference that T stay with Ivanez only until he was released from prison. Thus, this case differs from *A. L.*, where the parents'

entrustment of their children to the grandparents was not limited to a short-term and temporary period, and from *A. B.*, where we concluded that it was speculative to believe that the parents would remove the child from the grandmother's care. Consequently, given that father's argument on appeal is limited to the argument that the availability of his sister as a caregiver for T meant that the court did not have a basis for asserting jurisdiction, we conclude that the trial court did not err in taking jurisdiction of T based on the circumstances alleged by DHS, and we therefore affirm.

Affirmed.