Argued and submitted October 24, jurisdictional judgment reversed as to father; otherwise affirmed December 5, 2012

In the Matter of G. Q.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. Q.,
*Appellant.*

Marion County Circuit Court J051155;
Petition Number 091511QUI1;
A151092

292 P3d 616

Valerie Colas, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Shannon T. Reel, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

Father appeals a juvenile court judgment in which the court took jurisdiction over his child. The court did not assert jurisdiction as to father on the basis of any of the allegations as pleaded in the operative jurisdictional petition. Instead, the court determined that jurisdiction was warranted because the child's welfare was endangered "by reason of the following facts":

> "the child was previously a ward of the court, and the child's father failed to complete court ordered treatment, including chemical abuse treatment; coupled with a history of criminal activity, and incarceration, compromises his ability to safely and consistently and appropriately parent."

We agree with father that the evidence in this case is insufficient, as a matter of law, to support jurisdiction on that basis.

Father does not request *de novo* review of the facts, and we do not view this as the sort of exceptional case in which *de novo* review is appropriate. *See* ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases.").

> "Therefore, our task is to review the facts found by the juvenile court to determine whether they are supported by any evidence, and then to determine whether, as a matter of law, those facts together with facts impliedly found by the juvenile court, provide a basis for juvenile court jurisdiction under ORS 419B.100(1)(c)."

*Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010). We describe the facts in accordance with that standard.

The Department of Human Services (DHS) first petitioned for jurisdiction over the child in October 2005, when she was just under two months old, based on allegations that mother's mental-health difficulties, history of methamphetamine abuse, and "history of failed parenting" compromised her ability to care for the child. DHS later filed

an amended petition that added allegations about father, and, in January 2006, the juvenile court entered a jurisdictional judgment based on father's admission to these allegations:

"The conditions and circumstances of the child are such as to endanger the welfare of the child by reason of the following facts: The child's father has a chemical abuse problem involving controlled substances, including methamphetamine, that disrupts his ability and availability to adequately and appropriately parent, that compromises his mental health, [and] that endangers his liberty and sobriety to appropriately parent.

"* * * * *

"The conditions and circumstances of the child are such as to endanger the welfare of the child by reason of the following facts: The child's father has 2 other kids currently in state care."

The juvenile court "pended" additional allegations regarding father's history of criminal behavior and domestic violence, and it dismissed an allegation that father needed the court's and the state's assistance to attain and maintain sobriety and parenting skills.

At about the same time, DHS provided father with a letter of expectation describing activities it expected him to undertake with the goal of overcoming his methamphetamine abuse, including successfully completing a drug and alcohol assessment and any recommended treatment, submitting to urinalyses (UAs), completing a psychological evaluation and any recommended treatment, successfully completing a DHS-approved parenting program, and completing domestic-violence intervention treatment.

After a March 2006 review hearing, the court found that father had not made sufficient progress toward meeting those expectations. The court ordered that, to come into compliance, father would have to provide clean UAs, obtain a psychological evaluation, and start parenting classes. In a new judgment, the court asserted continuing jurisdiction based on allegations that father and mother had admitted, and it dismissed the domestic-violence allegation. Father briefly "reengaged" in outpatient drug and alcohol treatment at some point in 2006.

In November 2006, the juvenile court ordered that the child be returned to the parents' home, with legal custody remaining with DHS. The court ordered both parents to submit to random UAs at DHS's direction. In March 2007, the court again continued custody with DHS, but placed the child with mother, with father having visitation. The court again ordered father to engage in drug and alcohol treatment. According to a DHS caseworker, father had participated in a drug and alcohol assessment in February 2007, which resulted in a recommendation that he participate in out-patient treatment that would involve "at least three groups per week," but he "did not return for groups." Father did not complete that or any other substance-abuse program.

In December 2007, the court determined that mother had made sufficient progress toward meeting expectations. The court also found that father was "not involved in [the] case" (he apparently had moved out of the family's home). After an April 2008 review hearing, the court again found that father had not made sufficient progress and needed to complete drug and alcohol treatment. In addition, the court indicated, he needed to be "available to parent/visit" the child.

The juvenile court terminated wardship over the child in October 2008 on the ground that she had been reunited safely with mother. From then until September 2011, DHS had no more involvement with the child. The regularity of father's visits with the child over those three years is disputed. A DHS caseworker testified in 2012 that, according to reports from other family members, father had visited the child only sporadically. Father testified, to the contrary, that he had visited the child almost every week and did not believe that he ever had gone more than two weeks without seeing her.

It is undisputed, however, that father's criminal history includes activity from that period. In late December 2007, father received a probationary sentence for an identity-theft conviction. A year later, father was convicted of giving false information to a police officer. The nature of his sentence on that conviction is not clear from the record, which does not indicate whether any incarceration interfered

with his ability to visit the child. Next, father was arrested for possession and delivery of methamphetamine in August 2009. Father served a parole sanction for that violation, but again the record does not include evidence establishing whether that sanction interfered with his ability to visit the child. The record includes no evidence of father having engaged in any criminal activity since 2009.

In September 2011, DHS again petitioned for jurisdiction over the child and the juvenile court awarded DHS temporary legal custody based, in part, on mother's renewed substance abuse. Mother admitted to a jurisdictional allegation related to her substance abuse, and the court asserted jurisdiction over the child on that basis. In late 2011, DHS reported that the child had been diagnosed with adjustment disorder with anxiety, neglect, and post-traumatic stress disorder and that she was engaged in weekly mental-health counseling.

Father started visiting the child at DHS offices in October 2011 and continued weekly visitation through the time of the February 2012 jurisdictional hearing that resulted in the judgment currently at issue on appeal. During that time, none of father's visits with the child was terminated because anybody believed that father was "drug affected." Soon after the court placed the child back in DHS's custody, the agency apparently arranged for father to get a drug and alcohol assessment, but the record does not reflect whether that occurred or what the results of any assessment may have been.

In an order entered after a January 2012 hearing that preceded the jurisdictional hearing, the juvenile court found that conditions necessary for returning the child to her parents had not been established. Specifically, the court found that mother needed to engage in drug and alcohol treatment, demonstrate an ability to maintain sobriety, and obtain stable housing. The court found that father had made some progress, but still needed to maintain contact with DHS, establish a consistent relationship with the child, and obtain stable housing. In addition, the court noted, father had agreed to submit to UAs. DHS placed father "on the UA hotline" because he did not have a telephone number where

DHS could reach him. On February 13, DHS requested through the hotline that father submit to a UA. A DHS caseworker testified that he "did not show up."

Before the February 23, 2012, jurisdictional hearing, mother admitted to a jurisdictional allegation related to the child's history in care and mother's substance abuse. Accordingly, the hearing proceeded only on the allegations related to father, which included claims that father's whereabouts were unknown and that he had "not maintained a parental relationship with the child," as well as allegations related to substance abuse.[1]

The state's only witness was a DHS caseworker who testified that father had an unresolved drug problem that "continuously puts [the child] at risk of harm." Father had told the caseworker in December 2011 that he had been clean for 11 months without participating in treatment; according to father, "he got tired of the lifestyle and decided to stop using." The caseworker testified that she had worked with many drug-affected parents and could not recall any situations in which a parent had been able to overcome a methamphetamine addiction without treatment.

The child's attorney called father as a witness. He acknowledged that he had not yet been able to develop a plan for reuniting with the child, given his homelessness:

"Right now I am looking actually for a place to live. I don't really have a place to live right now, so until I can get situated, and—and have—you know, stable for myself, then I can hopefully make a plan for [the child]."

With respect to the substance-abuse allegations, father reiterated what he had told the DHS caseworker: that he had been clean for over a year, although he had not participated in any treatment since sometime between 2006 and 2008. Father testified that he had not realized that he missed his UA on February 13 until later that day,

---

[1] We cannot discern the exact nature of the pleaded substance-abuse allegations from the electronic juvenile court file in this case, as it appears that a separate small piece of paper was fastened to the original petition, covering most of the pertinent allegation. On that smaller paper, somebody wrote, "Ct. finds juris. on amended allegation after adj. on own motion," apparently referring to the basis for jurisdiction as to father that the court announced orally at the close of the hearing.

explaining that he had "a lot of things going on right now," including a relative's death, and had "been homeless also lately, so—you know, it [had] been kind of hard to just get around, and jump up and run to a UA," especially because he had been living in Woodburn. When the juvenile court asked whether father had been incarcerated because of substance abuse since 2005, father initially said he had not. When confronted with the fact of his August 2009 arrest for possession and delivery of methamphetamine, however, father eventually acknowledged that he had been arrested and had served a parole sanction.

At the end of the hearing, the state asked that the petition be amended "to include that language that [father] is currently homeless, and does not have stable living conditions." In closing argument, DHS argued that the court should find father not to be credible, given his suggestion that he had just forgotten about his 2009 arrest and his testimony that he had cured himself from methamphetamine addiction, combined with his missed UA. DHS also argued that father's lack of a viable plan for the child also continued to put the child at risk, given father's homelessness.

Father acknowledged his homelessness and that he "would need the assistance of the Court and State," but argued that he did not have such a lack of relationship with the child that it put the child at risk. To the contrary, father argued, his visits with the child had been going fine and had not resulted in any concerning behaviors on her part. Father also argued that DHS had not established "that there is a current drug and alcohol condition" that endangered the child's welfare. The state responded, "You have to believe him that he dealt with this issue on his own to believe that that threat has abated. * * * [T]he evidence suggests he is not to be believed."

The juvenile court found that father was homeless and had not maintained a consistent parental relationship with the child, but agreed with father "that there is not enough in that allegation and in the proof to support that that alone, the lack of a consistent parental relationship, has endangered her welfare." Accordingly, the court dismissed

the allegation related to father's homelessness and lack of relationship with the child. Instead of relying on the pleaded allegations, the court announced a different basis for jurisdiction, in accordance with its view of the evidence:

"On the other hand, I do have concerns that [father] was ordered, back when wardship was originally taken—jurisdiction was taken in 2005, to complete a treatment program. And basically, never did that, and continues to not complete treatment, and has most recently missed a UA because he has a number of things going. And he finds it difficult to remember those things.

"I am taking, based on the question that the Court had of [father] in terms of his—any criminal history, and the incarceration relating to controlled substances, I did take the opportunity then, given the fact that he had forgotten about the arrest in 2009 for the possession and delivery of methamphetamine, that he—I'll take judicial notice of the OJIN print outs.

"[Court describes father's three convictions between 2005 through 2008.] Then he has this 2009 [arrest for possession and distribution of methamphetamine].

"So based on that, I do find that it is in [the child's] best interest that jurisdiction is taken based on the following; that I am making the finding that I am making today. In that * * * would read, 'The conditions and circumstances of the child are such as to endanger the welfare of the child by reason of the following facts: the child was previously a ward of the court, and the child's father failed to complete court ordered treatment, including chemical abuse treatment; coupled with a history of criminal activity, and incarceration, compromises his ability to safely and consistently and appropriately parent.'

"And so I am going to make that amendment, and take jurisdiction based on that."

On appeal, father argues that the evidence is insufficient, as a matter of law, to support the juvenile court's determination to take jurisdiction on the basis it announced at the hearing. In particular, father contends, DHS "failed to prove that father's history of substance abuse and criminal activity would expose [the child] to a current threat of serious loss or injury should the court decline to assert

jurisdiction." In response, DHS points to (1) father's history of criminal activity and incarceration, (2) father never having completed court-ordered substance-abuse treatment after the child originally was removed from the parents' care in 2005 because they were using methamphetamine, (3) father having "avoided" the UA that DHS had requested shortly before the jurisdictional hearing, and (4) father's initial claim that he had not been arrested for drug-related crimes since 2005 when, in fact, he had been arrested for possession and distribution of methamphetamine in 2009. DHS argues that the juvenile court fairly could infer from those circumstances that father's claim of sobriety was not credible. DHS further contends that a sufficient connection exists between the reason that jurisdiction originally was taken in 2005—the parents' methamphetamine use—and what it views as "father's unresolved substance abuse issues" to establish the necessary nexus between father's behavior and a risk to the child. *See C. Z.*, 236 Or App at 442 (citing requirement of a "nexus between the parent's behavior and the particular risk to the child at issue").

The parties' arguments reflect the requirements of ORS 419B.100, which provides that the juvenile court has jurisdiction over a child "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others," and related case law. The requirement that the child be endangered is significant; the child must be exposed to "danger," that is, conditions or circumstances that involve "being threatened with serious loss or injury." *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011) (citations, internal quotation marks, and brackets omitted). Moreover, that threat "must be current"; it is not sufficient for the state to prove that the child's welfare was endangered sometime in the past. *Id.* The threat of serious harm to the child also cannot be speculative. Rather, "there must be a reasonable likelihood that the threat will be realized." *Id.*

This is a close case. Certainly DHS has reason to be concerned about the welfare of a child whose father has a history of using methamphetamine, repeatedly has engaged in other criminal behavior, and currently is homeless with no plan for obtaining stable housing suitable for a child. But the juvenile court did not take jurisdiction based on

the totality of those conditions and circumstances. *Cf. State ex rel Juv. Dept. v. Vanbuskirk*, 202 Or App 401, 405, 122 P3d 116 (2005) ("The key inquiry in determining whether 'condition or circumstances' warrant jurisdiction is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child."). To the contrary, the court dismissed as "not proven" the allegation (as amended at hearing) that father's homelessness and lack of a consistent relationship with the child endangered her welfare. Instead, the court took jurisdiction based solely on the following determination:

> "The conditions and circumstances of the child are such as to endanger the welfare of the child by reason of the following facts: the child was previously a ward of the court, and the child's father failed to complete court ordered treatment, including chemical abuse treatment; coupled with a history of criminal activity, and incarceration, compromises his ability to safely and consistently and appropriately parent."

We agree with father that, as a matter of law, the record does not support a determination that the child currently is endangered—that the child is reasonably likely to suffer serious harm in the absence of a jurisdictional judgment—because of *those* conditions and circumstances. Although father's methamphetamine abuse apparently resulted in the child being removed from his care in 2005, the record includes no evidence that he had used drugs in the year preceding the February 2012 jurisdictional hearing. Indeed, if father had not admitted to a DHS caseworker in December 2011 that he had used drugs 11 months earlier, there would be no evidence that he had had any involvement with drugs since his 2009 arrest.

We do agree with DHS that the evidence, including father's initial denial that he had been arrested on drug-related charges after 2005 and the excuses he gave for missing his UA, would support a determination that he is not credible. But the juvenile court's apparent disbelief of father's claimed sobriety is not affirmative evidence that he still was using drugs at the time of the 2012 hearing. *See State v. Reed*, 339 Or 239, 245, 118 P3d 791 (2005) (disbelieving a witness's testimony "does not add anything affirmative to the state's evidence"). Nor does the evidence from which the

court could find that father lacked credibility itself support an inference that father continued to use drugs. Father's agreement to submit to UAs was voluntary, as jurisdiction had not yet been established, and DHS had requested only one UA by the time of the jurisdictional hearing. Thus, this case does not involve the kind of pattern of missed court-ordered UAs from which a factfinder reasonably could infer that a person was attempting to hide his or her drug use. Moreover, father had been visiting the child weekly for several months preceding the 2012 jurisdictional hearing and never had been observed in a drug-affected state. In sum, the record simply includes no evidence supporting an inference that father was using drugs at the time that the juvenile court made the jurisdictional determination. Jurisdiction cannot be based on speculation that a parent's past problems persist at the time of the jurisdictional hearing in the absence of any evidence that the risk, in fact, remains. *Dept. of Human Services v. S. P.*, 249 Or App 76, 90-91, 275 P3d 979 (2012).

The evidence also does not support an inference that father is at such a high risk of relapse that there is "a reasonable likelihood" that he will start using drugs again *and* will do so in a way that puts the child at risk of serious harm. *See C. Z.*, 236 Or App at 442-44 (reversing jurisdictional judgment based on the mother's use of marijuana because the record lacked "evidence showing that mother's use of marijuana, her 'chemical abuse problem' as found by the trial court, [was] a condition or circumstance that pose[d] any risk to her children"). DHS relies, in part, on the caseworker's testimony that she has not worked with any other parent who has recovered from a methamphetamine addiction without undergoing treatment. But that generalized lay observation is not enough, standing alone, to support an inference that father is reasonably likely to relapse in a way that is reasonably likely to endanger the child, as it is not tied to any evidence related specifically to father. In the absence of relevant individualized evidence about father's current circumstances, the juvenile court erred in asserting jurisdiction on the basis of any concern about his potential for relapse.[2]

---

[2] We do not mean to discount the significant risks to children that often are associated with their parents' methamphetamine abuse; those dangers are

In addition to relying on his history of untreated substance abuse, the juvenile court cited father's "history of criminal activity, and incarceration" as part of its reason for asserting jurisdiction. But the record includes no evidence establishing that the child suffered in the past because of father's few non-drug-related convictions and no evidence establishing how that past criminal history presents a current threat of serious harm to the child, even in combination with father's history of methamphetamine abuse. In sum, the record does not include any evidence supporting the juvenile court's assertion of jurisdiction as to father.

A question remains regarding the appropriate disposition. The juvenile court also asserted jurisdiction as to mother, based on an allegation that she admitted. Mother is not a party to this appeal, and father has not challenged the jurisdictional determination as to mother. Accordingly, we reverse the judgment only as to father, and we otherwise affirm. *See Dept. of Human Services v. J. H.*, 248 Or App 118, 119, 273 P3d 203 (2012) (ordering that disposition in analogous circumstances).

Jurisdictional judgment reversed as to father; otherwise affirmed.

---

well-documented in our opinions. *See, e.g., State ex rel Dept. of Human Services v. J. S.*, 219 Or App 231, 258-66, 182 P3d 278 (2008). In this case, however, no evidence links those potential risks to father's current circumstances.