Submitted October 10, 2019, affirmed July 1, 2020

In the Matter of T. W.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. W.
and T. W.,
*Appellants.*

Deschutes County Circuit Court
18JU04347; A170794 (Control)

In the Matter of C. F. W.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. W.
and T. W.,
*Appellants.*

Deschutes County Circuit Court
18JU04348; A170795

468 P3d 1024

Parents appeal the judgments in which the juvenile court determined under ORS 419B.100(1)(c) that their children were within its jurisdiction. Parents contest that the circumstances leading to the removal of children from their home—mainly, persistent hunger, chronic school absenteeism, unsanitary and unsafe conditions in the home, and parents' volatility, mental health issues, and substance abuse—posed a risk of serious injury or loss to children. Parents also argue that, even if those circumstances were endangering, they were merely historical risks by the time that the juvenile court established jurisdiction over children. *Held*: Because the circumstances leading to removal of children were dangerous and parents had made insufficient progress to address their mental health and substance abuse issues, the juvenile court did not err in its determination that children's circumstances presented a current risk of serious loss or injury to children that was likely to be realized if they were in parents' care.

Affirmed.

Raymond D. Crutchley, Judge.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Shannon Flowers, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant C. W.

G. Aron Perez-Selsky filed the brief for appellant T. W.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Greg Rios, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

ARMSTRONG, P. J.

Affirmed.

## ARMSTRONG, P. J.

This is a consolidated appeal of judgments in which the juvenile court determined under ORS 419B.100(1)(c) that C and T (nine and 10 years old, respectively) were within its jurisdiction. Parents contest that the circumstances leading to the removal of children from their home—mainly, persistent hunger, chronic school absenteeism, unsanitary and unsafe conditions in the home, and parents' volatility, mental health issues, and substance abuse—posed a risk of serious injury or loss to children. Parents also argue that, even if those circumstances were endangering, they were merely historical risks by the time that the juvenile court established jurisdiction over children. We review the juvenile court's determination that it has dependency jurisdiction over children by viewing the evidence, "as supplemented and buttressed by permissible derivative inferences, in the light most favorable" to the juvenile court's determination and assess whether, when viewed that way, the record was legally sufficient to support the juvenile court's decision. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444, *adh'd to on recons*, 255 Or App 51, 296 P3d 606 (2013). Viewing the evidence of this case consistent with that standard, we affirm.

## I.   BACKGROUND

We describe the facts in two parts: (1) the period before children were removed from the home and placed in substitute care, April 2018 to October 2018; and (2) the period between the October removal and the jurisdictional hearing in late February and early March 2019.

A.   *Circumstances Before Removal to Substitute Care*

Three times the unsanitary condition of parents' home led to children's removal. In April 2018, Department of Human Services (DHS) caseworkers responded to a report in which T had told a staff person at his school that the strong smell of dog feces in his bedroom prevented him from falling asleep at night. Because of extremely unsanitary conditions, the caseworkers put in place a 10-day protective action plan, which included an offer of assistance for cleaning garbage in and around the home, whereby children were removed from

the home and stayed with a family friend. During that time, father was arrested on an unrelated outstanding warrant, but mother managed to clean the home. After DHS deemed it clean enough, children were returned home. The next month, however, children were again removed from their home after mother admitted to recent methamphetamine use, and, again, the home was unsanitary and unsafe for children. DHS placed children in foster care until October 2018 when they were returned to parents' care. That lasted three weeks. Children were yet again removed from the home because of the home's condition, among other reasons.

As for school, children would frequently miss school without explanation and, if they arrived, they would often arrive late. The extent of children's absenteeism meant that some of the gaps in their instruction could not be "made up" and was detrimental to their progress in school. Further, appropriate social behavior for T was challenging, and T's frequent absences made addressing those challenges more difficult. In addition to children's chronic school absentee-ism and tardiness, children often came to school hungry and appeared tired, disheveled, and dirty. T often fell asleep at school (described as "a pretty heavy sleep"), or, because he was tired, T asked for breaks or permission to go to the health room to sleep. C would report that she was hungry, complain about stomachaches, and say that she was wor-ried about not having enough food in the home or having to "bother" mother to prepare her something to eat. At one point, C was "shut down" and not engaged with her educa-tion. T and C would wear their clothes multiple times with-out being washed, and, at one point, their school sent home a hygiene kit.[1]

Mother has bipolar disorder, for which she refuses medication, and post-traumatic stress disorder (PTSD). Mother also is a long-time methamphetamine user. She was offered substance-abuse treatment but was willing to treat her addiction only as a "step forward to get [her] kids back." That is, because mother believed that she was not an "active

_____

[1] Parents do not argue (and we have not seen anything in the record to sug-gest) that financial circumstances prevented them from adequately clothing or feeding T and C.

drug addict," she did not feel that she needed treatment and would participate only if treatment was court-ordered. As for father, since 2015, he has been arrested, convicted multiple times for various offenses, and spent varying amounts of time in jail. Father also suffers from PTSD, which causes him to struggle in his frequent interactions with law enforcement. For example, on October 22, 2018, the day that children were placed in substitute care, father was arrested for an altercation he had with a police officer. When father was absent from the home because he was incarcerated, mother would become depressed and despondent, and do "crazy, stupid stuff" to a degree that she could not safely parent children alone.

B.   *Circumstances After Placement in Substitute Care*

Father began participating in mental health therapy with Viebeck in June 2018, a few months before his arrest and before children were removed for the third time and placed in substitute care. Father's treatment plan largely consisted of establishing a rapport between Viebeck and father, a process that Viebeck believed was essential and had to be taken slowly. Therapy also included gathering father's psycho-social history so that Viebeck could better understand father's PTSD, and discerning what factors in father's life triggered his stress levels so that he could help father understand them. As Viebeck explained it, the PTSD suffered by father is a condition that results in extreme reactivity, high stress levels that are associated with past trauma, and environmental triggers that cause panic attacks that include flashbacks and reexperiencing of traumatic events, which results in aggressive behavior. That is, anything that could be perceived by father as damaging, harmful, or threatening to him or his family—including law enforcement officials and other people in authoritative positions—would be "very triggering" or cause reactivity. Viebeck explained that father's PTSD put him in "fight or flight mode virtually at all times," with father being more prone to "fight" than "flight."

When Viebeck was asked if he still expected events to trigger father's aggression, he replied "absolutely" and said that father was not cured of his PTSD. When father

began treatment with Viebeck, he was a "one" on a scale of one to five for his ability to cope with stress and, by the time of the jurisdictional hearing, he had progressed to a "two." Father's treatment was at its beginning stages—it had taken Viebeck a long time to establish trust and rapport with father—and had progressed to father examining his attitudes toward law enforcement. Trust, rapport, recognition of triggers, and a calmer presentation were precursors to intensive trauma therapy that could directly treat father's PTSD and his reactivity toward authority figures. Although an estimate of how long father would need continued therapy was difficult, Viebeck guessed that father needed at least six or nine more months—*if* father stayed engaged and continued to attend therapy sessions.

Father had made some other improvements during therapy, particularly in the two or three months leading up to the jurisdictional hearing. Father showed more trust in Viebeck, divulging more of his traumatic history and deeper frustrations, and showing more emotion. Father was less externally motivated and more self-motivated to get better, which was achieved by insight into his PTSD. Father diligently attended his therapy sessions—except when he was incarcerated—even though father could not drive himself (due to a license suspension) and depended on friends to get him to the therapy sessions.

At the time of the jurisdictional hearing in February and March 2019, mother had just begun mental health therapy a few weeks before the hearing; she had not made any significant progress in treating her mental health issues or substance abuse. In December 2018, mother admitted that she had relapsed and used methamphetamine while father was in jail, and, during a supervised visit that month, mother showed signs that she was "under the influence" and "interacted minimally" with T and C. In another supervised visit, shortly before the jurisdictional hearing, mother again exhibited signs of methamphetamine use.

At the time of the hearing, father faced potential jail time for the October 2018 altercation with the police officer and a separate driving-while-suspended citation. Given the possibility that father's behaviors would again

lead to incarceration, father and the paternal grandmother agreed that, if that happened, the paternal grandmother and mother would work together to parent children. The paternal grandmother and mother also had discussed how they would care for children should father return to jail and that the paternal grandmother would help mother with children by making sure they were ready for school and helping with meals. The paternal grandmother lived on the same property as children, and, in the past, if mother needed help, for example, obtaining an ingredient for preparing a meal, the paternal grandmother would help if asked. But the paternal grandmother's help had its limits: When children were removed in May 2018, they were not placed with the paternal grandmother, partly because she had reported that she did not want to raise any more children. Moreover, the paternal grandmother was afraid to check on children while mother was affected by methamphetamine.

## II.  DISCUSSION

In a dependency case, ORS 419B.100(1)(c) provides that a juvenile court has jurisdiction when a child's "condition or circumstances are such as to endanger the welfare" of the child. A child is endangered if the child is exposed to conditions or circumstances that "present a current threat of serious loss or injury." *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 61, 308 P3d 307 (2013). DHS has the burden of proof to establish that the threat is current: "[I]t is not sufficient for the state to prove that the child's welfare was endangered sometime in the past." *Dept. of Human Services v. M. Q.*, 253 Or App 776, 785, 292 P3d 616 (2012). DHS also has the burden of proving a connection between the allegedly risk-causing conduct and the harm to the children. *C. J. T.*, 258 Or App at 62. Further, the threat of serious harm to the child cannot be speculative; there must be a reasonable likelihood that the threat will be realized. *M. Q.*, 253 Or App at 785. Consequently, a juvenile court takes jurisdiction over a child under ORS 419B.100(1)(c) if the child's condition or circumstances give rise to a current threat of serious loss or injury that is reasonably likely to be realized. *Dept. of Human Services v. L. C.*, 267 Or App 731, 741, 343 P3d 645 (2014).

With that in mind, the juvenile court determined that dependency jurisdiction was warranted. Father suffered from a mental health disorder[2] and mother suffered from mental health disorders and substance-abuse disorders that impaired parents' "abilities to maintain a clean, safe home for their children, provide food for them, and ensure the children's education." Both parents, the court determined, failed to consistently meet the physical, emotional, and educational needs of children. In the court's view, that was sufficient to establish a nonspeculative threat of serious loss or harm. The court continued substitute care for children.

On appeal, parents' argument regarding the juvenile court's determinations is two-fold. First, parents characterize the circumstances that led to the removal of children as missing school, performing below grade level, and experiencing anxiety. And, although they acknowledge that the lives of children were less than "ideal" or "optimal," it is parents' position that children's circumstance were insufficient to establish that children were at risk of serious loss or injury and therefore did not merit state intervention by means of dependency jurisdiction. Second, parents argue, to the extent that those circumstances were sufficient to merit dependency jurisdiction, by the time of the jurisdictional hearing, they were merely historical and there was therefore insufficient evidence that children were exposed to a current risk of serious loss or injury. Parents assert that father's gains in mental health therapy with Viebeck were sufficient to ameliorate any past deficiencies in children's care. Further, parents argue that they recognized that, if father was incarcerated, mother required mental health support, sobriety, and help caring for children. In their view, the plan to have the paternal grandmother help mother care for and protect children if father was absent because of incarceration was enough to establish that DHS failed to meet its burden of establishing current risk of harm.

DHS responds that the circumstances showed a current threat because father's PTSD persisted and remained

---

[2] DHS had also alleged that father has long-standing substance-abuse issues that interfere with his ability to safely parent children. The juvenile court determined that the evidence did not support that allegation.

a danger to children—the PTSD increased the risk of his incarceration, which would make him unavailable to parent. That, in turn, put children at risk of harm if they were to be left alone with mother. Further, DHS asserts that, in the past, when father was incarcerated, mother was unable to maintain a sanitary and safe home. DHS also challenges the contention that father's mother could mitigate the risk of harm if father is incarcerated; the paternal grandmother expressed reluctance to raise more children and had been afraid to go into the house to check on children when mother was using methamphetamine.

To begin with, we reject parents' contention that the circumstances of children when they were living with them were not a serious threat of harm. The circumstances of children were dangerous: (1) their home was unsanitary and unsafe—the condition of the home caused DHS to remove children from the home three times over the course of six months; (2) children's routine school absences and lateness were detrimental to their education; (3) children were regularly hungry; (4) mother has substance-abuse disorders and a bipolar disorder; and (5) father has PTSD, which leads to threatening and aggressive encounters with authority figures, causing frequent incarceration. Those conditions, and parents' deficits, caused children anxiety, tiredness, inability to focus, and interfered with their ability to learn.

Moreover, we disagree that those conditions are akin to cases in which we have held that a parent's "less than ideal" parenting did not warrant the state's intervention. *See, e.g.*, *Dept. of Human Services v. D. M.*, 248 Or App 683, 687-88, 275 P3d 971 (2012) (mother allowing daughter to overhear conversation about mother's former activities as a professional escort and adult dancer, allowing daughter to receive expensive gifts from an adult male, and failing to supervise child's internet use was not a threat of serious loss or injury); *State ex rel Dept. of Human Services v. D. T. C.*, 231 Or App 544, 554, 219 P3d 610 (2009) (although father's drinking, which caused him to be mean and controlling and to scare children, was not "ideal parenting," it was "not inherently or necessarily more harmful or dangerous than other varieties of parenting that would, by no stretch of the imagination, justify state intervention into the child-parent

relationship"). In this instance, the type, degree, and duration of harm was reasonably likely to cause serious injury or loss to children. *See Dept. of Human Services v. S. D. I.*, 259 Or App 116, 121, 312 P3d 608 (2013) ("[A] court cannot take jurisdiction over a child based solely on *some* risk of harm; the type, degree, and duration of the harm must be such that exposure to a reasonable likelihood of that harm justifies juvenile court jurisdiction." (Emphasis in original.)).

Further, the risk of harm to children was current. Neither parent has sufficiently addressed the mental health or substance-abuse issues that impair their ability to safely parent T and C. Although father has made strides in therapy and his willingness to treat his PTSD is commendable, parents overstate how much progress father had made at the time of the jurisdictional hearing.[3] Father had much further to go. His therapy had not yet progressed to directly treating father's PTSD and his reactivity toward authority figures. Without having even begun the necessary intensive trauma therapy, father's ability to manage his PTSD and associated symptoms meant that the risk of incarceration was too great, and, if he is incarcerated, children will be left in the care of mother, who cannot safely parent children by herself.

Mother has made negligible or no progress in treating her bipolar disorder and substance-abuse disorder, and parents do not assert on appeal that any progress mother has made is enough to safely parent children. Rather, parents point to the arrangement that they had with the paternal grandmother to help care for children in the event of father's incarceration. However, this is not a circumstance similar to those in which we have held that jurisdiction over children was not warranted because parents had entrusted the primary care or ceded custody of children to relatives. *See Dept. of Human Services v. A. B.*, 271 Or App 354, 373, 350 P3d 558 (2015) (because parents ceded custody of their child to paternal grandmother, it was speculative to conclude that parents posed a current risk of harm likely to be realized);

---

[3] For parents' argument that the risk of harm is not current, they solely depend on father's improvement in mental health therapy and do not challenge the likelihood of father's future incarceration as a basis for asserting that the harm is no longer current.

*Dept. of Human Services v. A. L.*, 268 Or App 391, 400, 342 P3d 174 (2015) (concluding that, "[b]ecause parents have entrusted the primary care of the children to the paternal grandparents, who do not pose a current threat of harm, the court did not have a basis for asserting jurisdiction over the children"). Here, parents did not cede custody or entrust the primary care of children to the paternal grandmother. Even so, any assistance the paternal grandmother had provided in the past was not enough to prevent the chronic hunger, unsafe living conditions, and chronic absenteeism of children while they were in parents' care. There is no reason to believe that any assistance grandmother could provide in the future would be enough to ameliorate the risk of harm to children.

Consequently, the risks to children were not merely historical by the time of the jurisdictional hearing: Neither parent had done enough at that point to address their issues that led to the removal of children. The record is therefore sufficient to support the juvenile court's determination that both parents had mental health problems and mother had a substance-abuse problem that presented a current risk of serious loss or injury to children that was likely to be realized if they were in parents' care. We affirm the jurisdictional judgment.

Affirmed.