No. 567 August 14, 2024 375

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of L. B. L.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. R. L.
and L. B. L.,
*Appellants.*

Yamhill County Circuit Court
22JU05060; A181013

Cynthia Kaufman Noble, Judge.

Argued and submitted October 11, 2023.

Erica Hayne Friedman argued the cause for appellant L. B. L. Also on the brief was Youth, Rights & Justice.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Kyle Sessions, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant S. R. L.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Jacquot, Judge.

JACQUOT, J.

Reversed.

Joyce, J., concurring in part, dissenting in part.

## JACQUOT, J.

Child, age 10, was removed from mother's care in October 2022 when, after a period of approximately three weeks without access to Adderall, he physically assaulted staff members at his school; at the time, mother also was not protecting child against contact with her husband, Smith, who had abused child. Several months later, in February 2023, on the petition of the Department of Human Services (DHS), the juvenile court took dependency jurisdiction over child based upon the following findings: Mother is unable to meet the child's medical and safety needs; mother lacks the parenting skills to safely parent the child; and mother exposes the child to unsafe circumstances. Mother and child both appeal, assigning error to the exercise of dependency jurisdiction and the determination that each of the jurisdictional bases exposed the child to unsafe circumstances at the time of the jurisdictional hearing. We conclude that the court erred in exercising jurisdiction because, by the time of the hearing, the circumstances that led to child's removal from mother's care had changed and, under the circumstances at the time of the hearing, any risk of further harm was speculative. Accordingly, we reverse.

### STANDARD OF REVIEW

Pursuant to ORS 419B.100(1)(c), "the juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age" and "[w]hose condition or circumstances are such as to endanger the welfare of the person or others." In order to take jurisdiction under that statute, "the state must prove, by a preponderance of the evidence, that a child's welfare is endangered because, under the totality of the circumstances, there is a current threat of serious loss or injury to the child that is reasonably likely to be realized." *Dept. of Human Services v. K. C. F.*, 282 Or App 12, 19, 383 P3d 931 (2016).

No party has requested *de novo* review, and we do not exercise our discretion to conduct such review in this case. *See* ORAP 5.40(8)(c) ("[W]e exercise *de novo* review only in exceptional cases."). Accordingly, we "(1) assume the correctness of the juvenile court's explicit findings of historical fact

if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact *** the court implicitly resolved the issue consistently with that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences was legally sufficient" to permit the court's assertion of jurisdiction. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013) (en banc).

## FACTS

We describe the facts consistently with the above standards. The relevant historical facts are largely undisputed.

DHS removed child from mother's care in October 2022. It did so for two primary reasons: mother's inability to ensure that child received medication needed to help him control his behavior, and mother's failure to protect child from contact with Smith, from whom she was separated and who had abused child.

Specifically, with respect to mother's failure to ensure child's access to his medication, the court found that, for a period of two to three weeks, child did not have access to his prescribed Adderall.[1] Child's medical provider testified that, during that time period, there was an Adderall shortage, and the medication was not available at the family's local pharmacy. During this shortage, the clinic helped other parents to locate Adderall at other pharmacies in the county. Mother did not seek help from the clinic. As a result of the Adderall deprivation, child's behaviors escalated to the point that on one occasion he physically lashed out at teachers and staff, while kicking doors and screaming. The principal consequently called law enforcement later in the day after child continued to beat on doors, scream, and refuse to listen to school staff. Shortly thereafter, child's relative caregiver arrived to pick him up, but the school suspended, and later expelled, child.

---

[1] Mother testified at one point that she was giving child his afternoon dose of Adderall at home. The court found mother to be not credible, reasoning that she had previously testified inconsistently, and that child's behaviors were consistent with what the doctor testified could happen if child was not taking his Adderall dose.

With respect to mother's failure to protect child from exposure to Smith, that arose in part out of mother's reliance on Smith's mother to provide care for child. Mother married Smith in 2021. She decided to leave her home and the marriage a few months later after Smith had held a gun to her head; she feared his abusive behavior and his substance abuse. After she left, she had to rely on friends and relatives for housing. In April 2022, child revealed that, sometime in 2021, when Mother and child were living with Smith in his home, Smith had placed child in a dog kennel with a shock collar around his neck, and in a separate instance had thrown child off of his bunk bed. DHS and mother learned of the abuse simultaneously when child made disclosures.[2]

At the time of removal, mother relied on friends and family, including, notwithstanding Smith's abuse of both child and mother, Smith's mother, Melinda Smith,[3] to help her take care of child. Mother was working at a casino on the western edge of the county for days at a time, while child was living in a trailer with Melinda and going to school in Dayton. Because of this arrangement, Melinda was a contact who frequently interacted with the school when child had an issue that needed immediate response. At one point after mother learned of Smith's abuse of child, mother allowed child to go with Smith, child's two stepsiblings and Smith's current girlfriend, to a pumpkin patch for a Halloween outing. Melinda also allowed child to have some contact with Smith when child was in her care.

After child was removed from mother's care, he was placed in the care of mother's sister. DHS subsequently initiated this proceeding, seeking to establish dependency

---

[2] During a forensic interview, child made some other concerning statements about another individual, "Crazy John," but the full content of the statements was not clear from the record. Mother believed "Crazy John" was safe to be around child at the time of the hearing. The nature of DHS's concern about this individual and the disclosures child made are not contained in the record, and DHS conceded in closing,

"As far as the imminent threat of the unsafe persons on 3C, I concede *** I don't think that that's any proof there's a current risk to an unsafe person. Of course, you know *** no evidence of unsafety doesn't necessarily prove safety, so DHS hasn't been able to step away ***."

[3] To avoid confusion, we refer hereafter to Melinda Smith simply as Melinda.

jurisdiction over child. By the time of trial on February 16, 2023, mother had secured new living accommodations for herself and child with friends. Her new home was adequate to meet the family's needs, and DHS had not discovered any problematic criminal or agency history for her friends. However, DHS had not yet tried an in-home plan, because mother had not been able to predict for DHS all of the adults who would have contact with child. Child was finally admitted to another school that the record showed was much better equipped to meet child's needs, more able to administer his Individual Education Plan (IEP), and able to assist with his behavioral issues. Further, child had recently started counseling again, and mother testified that she intended to continue treatment. Continued DHS involvement was not required for child to continue the counseling. The new school also worked out a plan for child to receive both Adderall doses at school, one with breakfast and one with lunch. Finally, mother's sister planned to transport child from mother's new residence to child's new school and back to assist mother once child returned home.

DHS agreed that, at the time of the jurisdictional hearing, there was no evidence of a current risk of harm from unsafe individuals. However, the caseworker testified that he was not sure that mother would be able to keep up with child's needs. He also expressed concern that mother did not think it was urgent to follow up with meeting child's medical needs during that two-to-three-week period during which child did not have his doses of Adderall, and he was curious whether she would in the future. He also expressed concern about mother's testimony that she was looking for work, which would mean she would have to find other people to meet child's needs during work hours.

JUVENILE COURT RULING

At the close of the hearing, the juvenile court determined that dependency jurisdiction was warranted. The court found that mother did not suffer from mental illness, developmental disability, or substance abuse, and that "there certainly is evidence in the record about the child being high needs and the child needing mental health intervention and the child dysregulating without it." It

determined that mother's homelessness was relevant to the extent that she had some control over her housing situation and to the extent the situation destabilized child. The court noted inconsistencies in mother's testimony throughout the hearing with regard to whether child was getting his medications in October and later said it did not find credible mother's testimony that she was giving child his dose at home, because of the severity of child's behaviors at school. The court also made the following statements and findings:

> "So the burden of proof here as everyone has rightly identified is preponderance of the evidence and one of the things that we can look at is omission and being able to provide care for the child, certainly medical treatment would be an omission \*\*\* but there certainly is evidence in the record about the child being high-needs and the child needing mental health intervention and the child dysregulating without it.

> "\*\*\*\*\*

> "[T]he fact of the matter was that [child] had been on medication for a very long time that required upkeep of his prescription and mom was the person, she was the executive in charge, she had the duty as a parent to function in the ability to manage getting his medication refilled and, if a pharmacy didn't have it, to get ahold of the doctor's office to ask for help, mom struggled to do that. I accept on this record that [child] did not have his medication at the school for three weeks, \*\*\* that mom's first response was that it was her opinion because the pharmacy was out, later we heard from the physician's assistant it wasn't that the pharmacies were out, it's that there was a shortage, but different pharmacies could fulfill that in McMinnville, but that would require a certain amount of parental functioning to put the pieces together, and throughout this trial one of the things I've heard is that mother with obviously a love for her child and not through lack of intent, but there is a struggle to connect the dots and put the pieces together and to function in that parental role to make sure that the child's medical needs are taken care of, and because of that, that directly affects safety. \*\*\* [L]aw enforcement responding to a school when your behavior is out of control brings with it I think common sense would tell us a certain amount of trauma. The fact that it even got that far, the fact that it even happened, the fact that mom was not able

to be in touch with the school, and that that was not irregular that they couldn't get ahold of mom, in fact that was the norm that they couldn't get ahold of mom, that means we don't have a functional parent at the wheel."

The juvenile court also determined that mother was unable to meet child's high needs.

"I think we have to look at the totality of the circumstances, I don't think this is a case where if you try to isolate it down and you try to say there just a drip on the faucet here and then but over here this was an isolated drip and, well, but for this we wouldn't have a dripping faucet, but the truth of the matter is we've had a dripping faucet for some time eroding the wellness of [child], if this were a case where [child] was not high-needs, I think the analysis would be very different, but I think that the court has to recognize that [child] is high-needs, mom herself describes him as having some basic high needs as far back as kindergarten but mom was unable to connect the dots to get the help in a place with the structure in place that he would have needed ***[.]"

The court also found that mother lacked the parenting skills to safely parent the child, stating that mother had "an astonishing lack of insight into child safety" and only "recognize[d] safety concern with 20/20 hindsight," and mother "didn't know what to do with that safety concern."

The court expressed concern that, when mother learned of the earlier physical abuse at the hands of Smith, she did not obtain counseling for child. The court further reasoned that, with child's high needs and mother's failure to have back-up plans for when her initial plans failed, mother could not ensure that child's medical and safety needs would be met in the future.

The court's ruling on the "unsafe circumstances" is not clear, but it faulted mother for not doing more to preemptively confirm whether the people around child were safe, and for not getting counseling for child until after DHS had already removed child.

The court concluded,

"So I do find that the court should take jurisdiction of this case because I do believe that [child] as a high needs

child is exposed to conditions that present a current serious risk of injury that is likely to be realized because I think in mother's care it was happening and I see no reason to believe it would not continue to happen but for the current placement of temporary shelter, even during the life of this case there's been a continued inability to follow through and plan for [child]."

The court thereafter entered judgment taking dependency jurisdiction over child. Mother and child appealed.

## ANALYSIS

The question before us is whether the evidence before the juvenile court was legally sufficient to support the determination that, at the time of the hearing, mother lacked the ability to meet child's needs and that inability placed him at risk of serious loss or injury. On that point, we have explained that "[t]he requirement that the child be endangered is significant; the child must be exposed to 'danger,' that is, conditions or circumstances that involve 'being threatened with serious loss or injury.'" *Dept. of Human Services v. M. Q.*, 253 Or App 776, 785, 292 P3d 621 (2012) (quoting *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011)). "Moreover, that threat 'must be current'; it is not sufficient for the state to prove that the child's welfare was endangered sometime in the past. The threat of serious harm to the child also cannot be speculative. Rather, 'there must be a reasonable likelihood that the threat will be realized.'" *Id.*

The juvenile court found that child was without his Adderall for three weeks and, because of that, became so dysregulated that he assaulted school officials, had the police respond to school, and was expelled because of it. The court found that child had been abused by his stepfather and did not receive counseling to help him deal with the trauma that caused. The confluence of factors that collided to create the harm that resulted in child's removal, including some factors mother was responsible for and some she was not, boil down to these: Mother did not have her own home. She relied on relatives to provide a place for her and child to stay after fleeing from her abusive marriage to Smith in 2021. She had a suspended driver's license and was reliant

on public transportation or other people to transport child. She was working too far from Dayton to be home every day and sometimes had to rely on Melinda to handle day-to-day contacts with the school, including picking up child. There was a shortage of child's medication which made it difficult to locate and sometimes required travel to a different town to fill a prescription.

Although those facts would support a determination that, at the time of removal, child's condition and circumstances placed him at risk in a way that would permit dependency jurisdiction, dependency jurisdiction was not established at the time of the trial. Child had been out of his home for five months by the time the jurisdictional trial occurred, he was in a new school, and arrangements had been made to continue with the new educational program when he returned to mother's care at her new residence. The new school would assist in administering both doses of Adderall. Mother heard the physician's assistant's testimony and understood that the clinic could help locate Adderall if the shortage continued and she had difficulty obtaining child's medication. Mother's sister, who had served as child's foster parent since he was removed from mother's care, would continue to assist in providing care for him, eliminating the need for mother to rely on Melinda.

Given the change in circumstances from the removal date to the trial date, whether child remained at risk at the time of the trial ultimately turns on whether it is inferable from the circumstances that led to child's removal, when those circumstances are viewed in the context of mother's parenting history, that child remained at risk months after removal. We conclude that it is not.

First, the record reflects that the events that led to child's removal were singular. Child had been prescribed Adderall in 2019, and there is no evidence that, apart from the three-week period in question, mother ever failed to ensure that child had his medication. As for mother's reliance on Melinda for care, mother's circumstances did not provide her with many options and the record does not allow for the conclusion that Melinda herself was an inappropriate or incompetent care provider. The record shows that

Melinda had regular contact with the school, attended IEP meetings, and worked with DHS from the time of child's disclosures to the time DHS removed him several months later.

Second, apart from the circumstances involving inability to provide child's medication to the school and the subsequent crisis that led to child's removal, mother has provided adequate care for child over the course of his life and taken many steps consistent with safeguarding his health and safety. She has attended to his medical needs.[4] Mother raised her behavioral concerns with child's medical provider when he was in kindergarten. She worked with his Newberg school to establish his IEP and ensured that it transferred to his new school when they moved. She had sought counseling for child, discontinuing only because of interruptions caused by COVID. Though Smith clearly harmed child, it is undisputed that the abusive events occurred when mother was working and there is no indication mother knew about the abuse prior to DHS involvement. Even before child disclosed Smith's abuse, mother left the relationship when Smith threatened her with a gun, and DHS introduced no evidence that mother showed any inclination toward reconciling with Smith.

In arguing for a contrary result, DHS suggests that it is inferable that the child would again come to harm absent the court taking jurisdiction, given that mother does not have a "plan B" for every situation, has difficulty accessing resources, and is "unable to connect the dots," according to the trial court. The problem with generalized complaints about a parent's functioning is that the court is required to speculate *what* harm would befall the child, what *degree* it would assume, and for what *duration*. Many parental failures fall short of "model parent[ing]" but do not expose a child to a risk of serious injury that is likely to occur. *Santosky v. Kramer*, 455 US 745, 753, 102 S Ct 1388 (1982) (explaining that parental "fundamental liberty interest[s] * * * in the care, custody and management of their child does not evaporate simply because they have not been model parents");

_____

[4] Mother regularly took child to his annual check-ups and refilled his medications. In fact, child's medical provider testified that she did not see long-term adverse health consequences from child missing three weeks of Adderall due to the shortage.

*see also, e.g.*, *State ex rel Dept. of Human Services v. Shugars*, 202 Or App 302, 322, 121 P3d 702 (2005) (parent's inability to remedy strong odor of children was not model parenting and caused the children to be ostracized at school, but it did not endanger the children). Here, there is simply no basis in the record to infer that, as of the time of the dependency trial, the issues that led to child's removal more likely than not would recur. *M. Q.*, 253 Or App at 787 ("Jurisdiction cannot be based on speculation that a parent's past problems persist at the time of the jurisdictional hearing in the absence of any evidence that the risk, in fact remains[.]").

Judge Joyce, in her dissent, is concerned that mother's criteria to determine which individuals are safe to be around child have left him susceptible to unsafe individuals in the past and will do so again in the future. Mother testified that she relies in part on child's reaction to a person and her own impressions of how much the person cares about child to determine whether the person is safe to be around him. While we agree that mother needs to exercise independent judgment to determine whether people who have caregiving responsibilities for child are safe despite child's interest in and request for contact, we believe reasonable parents take those considerations into account. There is no basis in the record to believe that Smith will continue to have contact with child, and, as DHS admitted at trial, there was not a *current* safety risk presented by others in mother's orbit or her proposed living situation.

In *M. F.*, we reversed a jurisdictional judgment over a child with serious and pervasive disabilities because DHS did not make an affirmative showing that the father's current plan would lead to a reasonable likelihood of serious injury to the child. *Dept. of Human Services v. M. F.*, 294 Or App 688, 699, 432 P3d 1189 (2018). We stated,

> "Child indisputably has extraordinary needs that demand a vigilant parent. One may reasonably wonder whether, over time, father will be able to consistently meet the demands of caring for her. But every young child has needs that require focused caregiving, and a juvenile court cannot assert jurisdiction over a child simply because it is concerned that a parent might not be sufficiently attentive. Put differently, DHS does not prove a basis for dependency

jurisdiction merely by establishing that one cannot be certain that child's mother or father will be up to the task of parenting. Rather, DHS must come forward with evidence sufficient to establish that the parent *in fact* has parenting deficits that create a current threat of serious loss or injury to the child that is reasonably likely to be realized. The same is true here, even though the demands on this child's caregivers will be far greater than average. In our view, evidence regarding the totality of the circumstances—including child's special needs, father's previous lack of involvement with child, his failure to adequately supervise her in 2015, and his lack of optimal engagement with DHS and service providers—does not support a determination that father would *currently* fail to attend to child's needs and that serious loss or injury is reasonably likely to follow."

*Id.* (internal citations and quotation marks omitted, emphases in original).

The same is true here; the record does not contain evidence that, at the time of the hearing, mother would "*currently* fail to attend to child's needs and that serious loss or injury is reasonably likely to follow." Instead, the record supports the inference that, in the midst of an extraordinarily challenging confluence of events, mother failed to meet child's needs on that occasion.

## CONCLUSION

Many families have unexpected circumstances they do not plan for. Many do not respond optimally. But the law does not allow for dependency jurisdiction based on parenting mistakes that, although harmful, do not result in an ongoing risk of serious loss or harm. *See A. F.*, 243 Or App at 387 ("The fact that a parent engages in a behavior that could negatively affect his or her parenting does not necessarily mean that the behavior can serve as a basis for juvenile court jurisdiction over a child."). The idea that mother might, at some point, let something slip through the cracks, without evidence identifying what the future problem is likely to be, or that the problem that led to removal is likely to recur, does not justify dependency jurisdiction over this family. Although mother is still reliant on others to provide a home for her and child, there is no evidence in the record that she continues to have contact with people who are not safe for

child, and the uncontroverted evidence reflects that mother had shored up her support system by the time of the jurisdictional trial.[5] Because the state did not present evidence of the type, duration, or severity of harm likely to befall child in the care of his mother, as a matter of law, the exercise of jurisdiction was not proper. *See Dept. of Human Services v. C. J. T.*, 258 Or App 57, 63, 308 P3d 307 (2013) (jurisdictional judgment reversed because the record lacked evidence of a nexus between past conduct and future harm to the child); *Dept. of Human Services v. E. M.*, 246 Or App 76, 331 P3d 1054 (2014) (DHS must show that conditions causing threat of harm persist at the time of trial to a degree likely to result in a risk of serious injury to child); *Dept. of Human Services v. S. D. I.*, 259 Or App 116, 121, 312 P3d 608 (2013) (DHS must show type, degree, and duration of harm to the child to justify jurisdiction).

Reversed.

**JOYCE, J**., concurring in part and dissenting in part.

I concur with the majority's conclusion that the juvenile court erred in finding that mother was unable to meet the child's medical needs. But I disagree that the juvenile court erred in concluding that mother lacks the parenting skills to safely parent the child and exposes him to unsafe circumstances and that the child is exposed to a current risk of harm as a result. Accordingly, I dissent.

As the juvenile court found, mother demonstrated "an astonishing lack of insight into child safety[.]" It noted that mother "testified repeatedly that if a person is nice to her child and if her child responds well to a person, then they are safe," and only "recognize[d] safety concern with 20/20 hindsight" and "didn't know really what to do with that safety concern." The record amply supports those findings. Mother's husband, from whom she had separated, abused child, including by putting a shock collar on him, locking him in a dog cage, and throwing him off a bunk bed. After learning of the abuse, mother lived with her husband's mother

---

[5] It is not problematic for mother to delegate care to another individual, even if DHS cannot certify that person as a foster parent, so long as child's needs are met. *Dept. of Human Services v. A. L.*, 268 Or App 391, 400, 342 P3d 174 (2015).

and often left child with her. Mother acknowledged that it was likely her husband would have contact with child and that she could not prevent it. Despite her perceived inability to protect child against that potential contact, mother nevertheless believed that her husband's mother was a safe person for child to be around. Mother also allowed her husband to pick child up at school and allowed her husband to take child on an excursion with several other people because child wanted to go and she believed that the other adult on the trip would supervise. Child also described abuse at the hands of "Crazy John," but mother dismissed his disclosures as "incorrect."

At the jurisdictional hearing, when asked if she believed that her husband is a safe person, she replied, "I don't know," but also acknowledged that she told DHS he was unsafe. She also testified that Crazy John is a safe person, despite child's disclosures and despite DHS's concerns about him.

In light of that evidence, the juvenile court was entitled to conclude, as it did, that jurisdiction was warranted based on mother's lack of parenting skills to safely parent the child and exposure of the child to unsafe circumstances. And, given mother's testimony at the jurisdictional hearing that demonstrated her "astonishing lack of insight" into who was safe for child to be around, the juvenile court was also entitled to find that those harms existed at the time of trial.[6] In other words, this is not a case where the risk of harm is speculative. *See, e.g., Dept. of Human Services v. M. Q.*, 253 Or App 776, 787, 292 P3d 616 (2012) ("Jurisdiction cannot be based on speculation that a parent's past problems persist at the time of the jurisdictional hearing in the absence of any evidence that the risk, in fact, remains."). Rather, mother's testimony shows that the risk that she would expose child to unsafe individuals is nonspeculative and ongoing. Although the majority contends that "[t]here is no basis in

---

[6] The majority concludes that DHS conceded that there was no current safety risk. I read the record differently. DHS said that there is no proof of a "current risk" of exposure to an unsafe person but argued that "no evidence of unsafety doesn't necessarily prove safety[.]" That is, although mother was not currently partnered with an unsafe person, that alone did not render child safe from mother's decisions about who was safe to be with child.

the record to believe that [husband] will continue to have contact with child," the larger point is mother's lack of recognition of who—whether it be husband, husband's mother, Crazy John, or someone else—presents a present risk of harm to her child. ___ Or App at ___ (slip op at 13).

I therefore dissent.